582 So.2d 879 (1991)
Sonia LINARES
v.
LOUISIANA DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, et al.
Eduardo HERRERA
v.
BOARD OF COMMISSIONERS OF the PORT OF NEW ORLEANS, et al.
Nos. 90-CA-2156, 90-CA-2157.
Court of Appeal of Louisiana, Fourth Circuit.
June 13, 1991.
*880 Richard S. Vale, Blue, Williams & Buckley, Metairie, for defendant/appellant, Bd. of Com'rs of the Port of New Orleans.
Allan Berger and Kimberly S. York, Berger and Forstall, New Orleans, for plaintiff/appellee.
Lynn Lachin Lightfoot, Lightfoot & Lightfoot New Orleans, for appellee, Eduardo Herrera, as Sentry's Insured.
James R. Sutterfield, Lawrence J. Centola, Jr. and Donald A. Hoffman, Hoffman, Sutterfield, Ensenat & Bankston, New Orleans, for appellee, Seumas Ian Cowley, as Nominee for Certain Underwriters at Lloyds, London.
Frank E. Beeson, III, Guillot, Beeson, Usprich & Evans, New Orleans, for plaintiff/appellant, Sonia Linares.
Kathleen E. Simon, Simon and Rees New Orleans, for appellee, Eduardo Herrera, as Allstate's Insured.
Before SCHOTT, C.J., and BARRY and PLOTKIN, JJ.
*881 BARRY, Judge.
This appeal concerns a one car accident which occurred at approximately 11:30 p.m. on January 7, 1987 on the St. Claude Avenue bridge in New Orleans. The bridge crosses the Industrial Canal and is owned and operated by the Board of Commissioners of the Port of New Orleans (Port).
Sonia Linares and Eduardo Herrera were returning to Ms. Linares' home on the East Bank of the Industrial Canal after having dinner at Mr. Herrera's apartment. They were injured when their vehicle ran into the partially raised drawbridge.
Ms. Linares sued the City of New Orleans and the Louisiana Department of Transportation and Development. She amended her petition to add the Port as a defendant because the Port owned and operated the St. Claude bridge at the time of the accident. Mr. Herrera also sued the City, DOTD and the Port. The Port answered and filed a third party demand against Mr. Herrera. The cases were consolidated. The City and DOTD were dismissed by summary judgment.
The matter was tried without a jury on the question of liability and Ms. Linares' damages. Mr. Herrera's claim was not tried and is pending.
The court apportioned Mr. Herrera's liability at 25% and the Port's at 75%.
The court set Ms. Linares's general damages at $1,620,000 and her specials as follows:

Past medical expenses including
 hospital, prescription
 and supplies $125,600
Past lost wages $ 8,000
Future medical expenses including
 psychiatric treatment,
 surgery for removal
 of Harrington rods, urological
 followup and lab work,
 surgery relating to bladder,
 supplies, and prescriptions $190,000
Loss of future earning potential $ 50,000
 ________
 $373,600

The court rendered judgment against the Port; Louisiana Insurance Guaranty Association (LIGA), statutory successor to the Port's insolvent primary insurer; Seumas Ian Cowley as nominee for certain underwriters at Lloyd's, London, the Port's excess insurer (London Underwriters); Allstate Insurance Company, Ms. Linares' insurer and Eduardo Herrera and Sentry Insurance Company, Mr. Herrera's insurer, jointly, severally and in solido in the sum of $1,993,600, with legal interest from the date of judicial demand until paid, subject to the following restrictions:
1) The Port is liable solidarily for $873,600 plus interest;[1]
2) Louisiana Insurance Guaranty Association (LIGA) is liable solidarily for $149,900 plus interest;
3) London Underwriters is liable solidarily over $149,900 plus interest;
4) Allstate is liable solidarily for $30,000 plus interest;
5) Sentry is liable solidarily for $36,513 paid into the Registry of the Court and withdrawn by Ms. Linares.
A number of motions for a new trial were filed. The court amended the judgment to apportion fault of 12.5% to Herrera and 87.5% to the Port. Noting that two recent Supreme Court decisions had "transmogrofied earlier jurisprudence to a significant degree," the court dismissed London Underwriters because their excess policy did not drop down to afford primary coverage due to the insolvency of the Port's primary carrier. The judgment was amended to reflect that Allstate was only liable for its $10,000 policy limit plus interest.
Sentry, Allstate and LIGA paid their liabilities under the judgment and were released. Herrera and the Port have appealed.
The Port argues:
1) the trial court erred by holding that London Underwriters' coverage did not drop down to provide primary coverage;

*882 2) the trial court committed manifest error by assessing Herrera's fault at 12.5%.
Mr. Herrera argues that he was without fault.
Ms. Linares answered the appeal and claims:
1) the trial court erred by holding that London Underwriters coverage did not drop down;
2) the judgment should be modified to increase the award for loss of future earning potential to $289,000;
3) the judgment should include an award for loss of personal services in the amount of $250,000.

FACTS
The St. Claude bridge is equipped with a number of safety devices which are designed to prevent this kind of accident from happening. Each lane of traffic on the bridge has a barricade consisting of a movable arm centered with a stop sign which extends across the traffic lane. The barricades, warning bells and flashing red lights are controlled by the bridge tender. The speed limit on the bridge is 35 m.p.h.
The vehicle was traveling in the left of two traffic lanes. The weather was good with no visibility problem.
The drawbridge was partially raised but the barricade in the left lane was up. That scenario was normally impossible; however, the bridge's safety mechanism had admittedly been bypassed by a Port electrician. The end of the dark colored drawbridge was not illuminated or marked to indicate that it was raised.
Mr. Herrera testified that he was driving 35 m.p.h. and was halfway up the approach ramp to the bridge when lights began flashing. A car in front proceeded across the drawbridge. Mr. Herrera said when he was three-quarters up the ramp the barricade in the right traffic lane was lowered, but the barricade in his lane of travel was not lowered. He removed his foot from the gas pedal and slowed down. He and Ms. Linares decided that because no other car was on the approach ramp the attendant would allow them to cross before raising the drawbridge. Mr. Herrera accelerated the car and never saw the drawbridge go up. He did not remember crashing into the drawbridge. Mr. Herrera said that he had not been drinking and never exceeded the speed limit.
Ms. Linares confirmed Mr. Herrera's testimony in every respect.
Leroy Taylor, the bridge tender, testified that he had worked for the Port as a construction inspector since 1978. That position was eliminated and the Port made him a bridge tender. He received on-the-job training from the Corps of Engineers, but was not required to obtain certification or pass a written test. He had worked for two-three months before the accident. On the night of the accident Mr. Taylor had worked an eight hour shift and had started a second shift because his replacement was sick.
Mr. Taylor saw a tug approaching the bridge and turned on the warning lights and bells. He checked to determine if traffic was approaching, then lowered all of the barricades. He began to raise the bridge, then noticed a car approaching from the east. Mr. Taylor thought that the car was going too fast to stop and feared that it would run off the ramp into the canal, so he lowered the drawbridge and raised the barricade in the left lane. He could not explain why he raised the barricade. Mr. Taylor testified that the safety interlock mechanism should have prevented the barricade from going up while the bridge was raised. Mr. Taylor did not know the speed limit on the bridge but thought it was "about 25 miles an hour."
The safety logs for the bridge show that on September 23, 1986 a Port electrician bypassed the safety mechanism for the bridge.
Mr. Ray Burkhart, an expert in accident reconstruction, testified that the distance from the barricade to the drawbridge was 52 feet. A car travelling 35 m.p.h. would cover that distance in one second. He said the bridge was dark in color and lacked a reflective device on the end which would indicate it was raised.
*883 Mr. Burkhart stated that the primary cause of the accident was the lack of a barricade. He said the "custom is to let the red flashing lights and bell sound until traffic [clears] out and then the barricade goes down." Mr. Burkhart testified vehicles crossed the St. Claude bridge "all the time" with the warning lights flashing.

EXCESS INSURANCE COVERAGE
Shortly after judgment was rendered in this case, the Louisiana Supreme Court decided that the insurance contract determines whether an excess policy will "drop down" to provide primary coverage due to the insolvency of the underlying carrier. Robichaux v. Randolph, 563 So.2d 226 (La. 1990); Kelly v. Weil, 563 So.2d 221 (La. 1990).
The Kelly court distinguished between policies which provide that the excess insurer is liable in excess of the amount recoverable under the underlying insurance, and policies which provide coverage in excess of the limits of the policies covered by their excess policy. The latter policy does not provide for drop down coverage and excess coverage is independent of the ability to recover or collect the underlying coverage. Kelly, 563 So.2d at 222. Insurance coverage is unrelated to an insurer's solvency. Whether a loss is "covered" is determined by reviewing the risks specified in the policy, rather than by determining the carrier's ability to pay a claim.
The Port contends that London Underwriters' policy is ambiguous and must be construed against the insurer. Caraway v. Royale Airlines, Inc., 559 So.2d 954 (La. App. 2d Cir.1990).
The Port claims the following policy language is ambiguous:
UNDERLYING AMOUNTS
Underwriters hereon shall be only liable for the ultimate net loss the excess of either: (a) the amounts of the underlying insurance in respect of each occurrence covered by said underlying insurance, or (b) $500,000 ultimate net loss in respect of each occurrence not covered by said underlying insurance....
It being understood and agreed by the Assured that the Underlying Amounts shall only comprise the payment of actual damages which would, except for the amount thereof, be insured by this Policy and that the Named Insured shall in addition thereto bear all legal costs and expenses incurred up until such time as the Underlying Amounts are exhausted. Underwriters agree that the Assured may obtain insurance in respect of all or any part of the Underlying Amounts and the legal costs and expenses in addition thereto but Underwriters shall not contribute with such insurance in the event that such insurance covers Bodily Injury, Personal Injury, Property Damage ... also covered by this Policy.
Under that language the Port has the unambiguous option to obtain insurance for all or part of the underlying amount ($1,000,000) or to self-insure for that amount. The Port opted to carry $1,000,000 primary coverage.
Section I of London Underwriters' policy provides:
INSOLVENCY
The insolvency, bankruptcy or receivership of the Assured or any entity comprising the Assured shall not relieve Underwriters of the obligation to pay claims hereunder nor shall the insolvency, bankruptcy, receivership or any refusal or inability to pay of the Assured and/or any Insurer and/or any Underwriter operate to:
(a) deplete the underlying amount(s) and/or self-insured retention(s) applicable under this policy.
(b) increase Underwriters' liability under this Policy.
(c) increase any Underwriters' share of liability under this policy.
In no event shall the Underwriters of this Policy assume the responsibilities and/or obligations of the Assured and/or any Insurer and/or any other Underwriter.
*884 Because of the terms and language of the insolvency clause, which is similar to Robichaux, the excess insurance policy does not "drop down" to provide coverage.
This assignment has no merit.

FAULT OF HERRERA
In response to Mr. Herrera's motion for a new trial the court reduced the apportionment of his fault from 25% to 12.5%. The court cited several reasons.
The court stated that when Mr. Herrera was on the up ramp he exceeded the appropriate speed under the circumstances. The court noted that under R.S. 32:56 and 32:234 a flashing red light is intended to direct a driver to stop. The court cited R.S. 32:231 which permits a traffic officer to direct otherwise and found that the bridge tender was a de facto traffic officer.
The court believed that Mr. Taylor closed and reopened the left lane barricade.
The court found an unreasonable risk of harm was created because the drawbridge could be raised while the vehicle barriers remained in an up position. The court found there was an unreasonable risk of harm because no reflective material was on the edge of the raised drawbridge to warn a motorist driving at night. The court found that the act of lowering and then raising the vehicle barrier would signal to an ordinary driver that there was no danger and he could proceed to cross.
We note that Mr. Herrera frequently crossed the bridge and was aware that the usual procedure was for the bridge tender to activate the lights and bells and allow traffic to clear before lowering the barricades.
The record clearly supports a finding that the inexperienced bridge tender's negligence was the overwhelming cause of the accident. The court's apportionment of fault was proper.

DAMAGES

Loss of Earning Potential
It was stipulated that Ms. Linares returned to her regular job and has a higher salary than when the accident occurred.
Ms. Linares' supervisor and co-workers stated that she was not as competent or competitive a worker and that her employment was somewhat protected by her present supervisor.
Mr. Roberts, an expert in vocational evaluation, testified that Ms. Linares' employer made accommodations for her disabilities and that she would be unable to obtain a job in competitive employment if she lost her present job.
Dr. Wolfson, Ms. Linares' expert economist, testified that if she was terminated as of the date of the trial, the present value of an amount needed to fund an annuity equal to her present $22,000 per year salary would be $293,603.
The record shows that Ms. Linares' earning potential has been reduced. The trial court acted within its much discretion by awarding $50,000 for this element of damages.

LOSS OF SERVICES
Ms. Linares contends that she should be awarded $250,000 for personal services which she cannot perform. She testified that she has difficulty cooking, shopping, gardening, doing laundry, ironing and cleaning house.
An award for loss of future services is extremely difficult to prove. To modify the judgment we must determine that the trial court was clearly wrong by failing to make such an award. Arceneaux v. Domingue, 365 So.2d 1330 (1978). We cannot do so.
The judgment is affirmed.
AFFIRMED.
NOTES
[1] The Port's liability is limited to $500,000 in general damages plus special damages. La.R.S. 13:5106(B).