767 So.2d 758 (2000)
Wade TERREBONNE, Individually and as Natural Tutor of the Minor, Derek James Terrebonne and Rachel Terrebonne
v.
John C. FLOYD, M.D.
No. 99 CA 0766.
Court of Appeal of Louisiana, First Circuit.
May 23, 2000.
*759 Sean D. Fagan, Baton Rouge, for Plaintiff Appellant Wade Terrebonne, et al.
Emilie M. Daye, Joseph A. Reilly, Jr., Houma, for Defendant Appellee John C. Floyd, M.D.
Before: COOKS, WOODARD and AMY, JJ. Judges Pro Tempore by special appointment of the Louisiana Supreme Court.
COOKS, Judge Pro Tem.
Plaintiffs appeal the trial court's judgment granting defendant's motion for summary judgment. The court found because plaintiffs failed to retain an expert to testify on the standard of care required of an obstetrician/gynecologist, they will not be able to meet the burden of proof to prevail on the alleged medical malpractice claim. For the following reasons, we reverse.

FACTS
On September 1, 1994, Rachel Terrebonne visited Dr. John C. Floyd, a gynecologist, complaining of left lower quadrant pain. Dr. Floyd treated Mrs. Terrebonne for endometriosis several years prior to this visit. On this date, his physical examination of her revealed no distinct uterine mass. He ordered certain blood tests, a pelvic ultrasound, and a urine pregnancy test. The urine pregnancy test result was negative. When Mrs. Terrebonne returned the next day, she was advised by Dr. Floyd that the ultrasound revealed a cyst in her left ovary. Dr. Floyd concluded her pelvic pain was the result of endometriosis. He ordered a second urine pregnancy test; and the result again was negative. He then prescribed a 150 milligram injection of Depo-Provera to treat the suspected condition. Mrs. Terrebonne was instructed to return in two to four weeks for a follow-up examination.
On September 8, 1994, six days after receiving the Depo-Provera injection, Mrs. Terrebonne telephoned Dr. Floyd's office complaining of nervousness. Dr. Floyd's office informed her this was a normal side effect of Depo-Provera. She called again two days later complaining of depression and uncontrollable crying. Dr. Floyd prescribed Xanax, an anti-depression drug to treat this condition. On September 30, Mrs. Terrebonne finished taking the prescribed doses of Xanax and called Dr. Floyd to request a refill. Dr. Floyd advised her to return to his office for a "check-up." An appointment was scheduled for this visit on October 3, 1994.
On October 3, 1994, Dr. Floyd ordered a third urine pregnancy test. The result was positive for pregnancy on this occasion. A later ultrasound confirmed Mrs. Terrebonne was seven weeks pregnant. Blood results revealed she had a low progesterone level, prompting Dr. Floyd to prescribe Micronized Progesterone to treat this abnormality. The weeks that *760 followed these discoveries were uneventful; and Mrs. Terrebonne delivered a son by caesarian section on May 15, 1995. The baby was born with a skull malformation known as craniosynostosis. This condition distorted the shape and appearance of Derek's face; and Derek's skull is incapable of enlarging without surgical intervention to accommodate the growth of his brain. On July 12, 1995, a craniofacial reconstruction was performed on Derek. Subsequently, two more surgical procedures were performed to enlarge his skull which will require regular surgical enlargement until he fully matures physically.
The Terrebonnes filed a complaint with the Patient Compensation Fund requesting a medical review of Dr. Floyd's treatment. They alleged Dr. Floyd breached the standard of care owed to Rachel Terrebonne when he prescribed Depo-Provera and Xanax in the early stages of her pregnancy; and his negligence was a cause in fact of Derek Terrebonne's skull malformation.
The Terrebonnes also alleged the package labeling for Depo-Provera includes a warnings section which, under the heading "Accidental Pregnancies," states:
To ensure that Depo-Provera is not administered inadvertently to a pregnant woman, it is important that the first injection be given only during the first 5 days after the onset of a normal menstrual period...
The same information is repeated in the "DOSAGE AND ADMINISTRATION" section of the label. The medical evidence shows Mrs. Terrebonne began her last menstrual period prior to receiving the Depo-Provera injection on August 15, 1994. She received the injection on September 2, 1994, eighteen days after the onset of her cycle; and thirteen days beyond the safety period specified by the drug's manufacturer.
Plaintiffs further alleged Dr. Floyd was negligent in prescribing Xanax to Mrs. Terrebonne. Xanax is a benzodiazepine class drug and its manufacturer warns "can potentially cause fetal harm when administered to a pregnant woman." The manufacturer also warns that the "possibility that a woman of child bearing potential may be pregnant at the time of institution of therapy should be considered."
The Medical Review Panel unanimously found Dr. Floyd did not breach the standard of care, noting he exercised adequate precaution in administering the drug and commenting that Depo-Provera is an accepted treatment for endometriosis.
The Terrebonnes then filed a medical malpractice petition in the district court against Dr. Floyd on August 25, 1997 essentially alleging the same complaints they asserted before the Medical Review Panel. Discovery was conducted and the matter was set for trial to commence on December 14, 1998. On November 23, 1998, Dr. Floyd filed a motion for summary judgment asserting because plaintiffs had not retained an expert obstetrician/gynecologist to establish the standard of care in this instance, they could not prevail on their medical malpractice claim against Dr. Floyd. Countering, plaintiffs argued the absence of such expert testimony was not fatal to their claim because the manufacturer's labeling and instructions which accompanied Depo-Provera and Xanax established the standard of care required of a gynecologist or any licensed prescriber of the noted drugs. Essentially, plaintiffs argued Dr. Floyd's use of the drugs contrary to the manufacturer's instructions constituted prima facie evidence of negligence.
The trial court, acknowledging this was a "very, very close issue," granted the motion for summary judgment. Plaintiffs appeal, asserting the trial court erred in granting the motion for summary judgment.

ANALYSIS
Appellate courts review summary judgments de novo under the same criteria *761 that govern the district court's consideration of whether summary judgment is appropriate. Potter v. First Fed. S & L, 615 So.2d 318 (La.1993). A motion for summary judgment should be granted if the pleadings, depositions, answers to interrogatories, and admissions on file together with affidavits show that there exists no genuine issue as to any material fact and that the mover is entitled to judgment as a matter of law. La.Code Civ.P. art. 966.
The first issue that must be addressed in reviewing a trial court's grant of summary judgment is whether any genuine issues of material fact exist. Smith v. Our Lady of the Lake Hosp. Inc., 93-2512 (La.7/5/94); 639 So.2d 730. The reviewing court must next address whether reasonable minds could conclude, based on the facts presented, the mover is entitled to judgment. Id. In other words, summary judgment is appropriate when all relevant facts are brought before the court, the relevant facts are undisputed, and the sole issue remaining is the conclusion to be drawn from the relevant facts. Id.
The 1996 amendment to the summary judgment provision changed pre-existing law by declaring that summary judgments are now favored. The amendment did not change the existing law and jurisprudence concerning genuine issues of material fact and the burden of proof applied to a summary judgment proceeding. Scott v. McDaniel, 96-1509 (La.App. 1 Cir. 5/9/97); 694 So.2d 1189, writ denied, 97-1551 (La.9/26/97); 701 So.2d 991. The burden is still on the mover to show there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law.
The controlling issue in this case is whether Dr. Floyd breached the standard of care owed to Rachel Terrebonne and her unborn child. The only admissible evidence which may be used to establish the standard of care owed by Dr. Floyd and its breach, defendants argued and the trial judge agreed, is expert testimony. Plaintiffs contend expert testimony is not the only evidence which they may use to establish this fact because the manufacturer's labeling and instructions which accompanied Depo-Provera and Xanax delineates the standard of care owed by Dr. Floyd.
A plaintiff in a medical malpractice case has the burden of proving the applicable standard of care, its breach, and causation. Pfiffner v. Correa, 94-924, 94-963, 94-992 (La.10/17/94); 643 So.2d 1228. The Louisiana Supreme Court in Pfiffner discussed the necessity of expert testimony in establishing the standard of care:
Although LSA-R.S. 9:2794(B) grants any party to the suit the right to subpoena any physician without his consent for a deposition or testimony at trial to establish this standard of care, see La. Rev.Stat.Ann. § 9:2794(B) (West 1991), the statute is silent as to whether such experts are necessary in order for the plaintiff to meet his burden of proof. A majority of Louisiana court of appeal cases have held that such expert testimony is necessary. (Footnote omitted) In other court of appeal decisions, however, the courts have stated that the standard of care for any particular community or locale, or specialty, is merely "best determined from the testimony of other experts in the field," not absolutely required. See Broadway v. St. Paul Ins. Co., 582 So.2d 1368, 1373 (La.Ct. App.2d Cir.1991) (emphasis added). Although such testimony is persuasive, it is not always controlling. See, e.g., Cherry v. Herques, 623 So.2d 131 (La. Ct.App. 1st Cir.1993); Linares v. Louisiana DOTD, 582 So.2d 879, 878 (La.Ct. App. 4th Cir.1991); Harmon v. Levenson, 534 So.2d 486, 488 (La.Ct.App. 5th Cir.1988); Coleman v. Touro Infirmary of New Orleans, 506 So.2d 571, 574 (La. Ct.App. 4th Cir.), writ denied, 507 So.2d 1247, 1248 (La.1987); Wiley v. Karam, 421 So.2d 294, 297 (La.Ct.App. 1st Cir. 1982).

*762 The jurisprudence has also recognized that there are situations in which expert testimony is not necessary. Expert testimony is not required where the physician does an obviously careless act, such as fracturing a leg during examination, amputating the wrong arm, dropping a knife, scalpel, or acid on a patient, or leaving a sponge in a patient's body, from which a lay person can infer negligence. See Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713, 719 (La. 1986). Failure to attend a patient when the circumstances demonstrate the serious consequences of this failure, and failure of an on-call physician to respond to an emergency when he knows or should know that his presence is necessary are also examples of obvious negligence which require no expert testimony to demonstrate the physician's fault. See id. at 719-20. Likewise, where the defendant/physician testifies as to the standard of care and his breach thereof, see, e.g., Riser v. American Medical Int'l Inc., 620 So.2d 372, 377 (La.Ct.App. 5th Cir.1993), or the alleged negligence consists of violating a statute and/or the hospital's bylaws, see, e.g., Hastings, 498 So.2d at 722 (violation of LSA-R.S. 40:2113.4 which imposes duty on a hospital to make emergency services available to all persons in the community without regard to income or insurance protection and hospital bylaws establishing duties for on-call physicians), expert testimony is also unnecessary to establish a malpractice claim.
We hold that expert testimony is not always necessary in order for a plaintiff to meet his burden of proof in establishing a medical malpractice claim. Though in most cases, because of the complex medical and factual issues involved, a plaintiff will likely fail to sustain his burden of proving his claim under LSA-R.S. 9:2794's requirements without medical experts, there are instances in which the medical and factual issues are such that a lay jury can perceive negligence in the charged physician's conduct as well as any expert can, or in which the defendant/physician testifies as to the standard of care and there is objective evidence, including the testimony of the defendant/physician, which demonstrates a breach thereof. Even so, the plaintiff must also demonstrate by a preponderance of the evidence a causal nexus between the defendant's fault and the injury alleged.
Id. at 1233-34. (Emphasis ours.)
The Depo-Provera labeling expressly provides "it is important that the first injection be given only during the first 5 days after the onset of a normal menstrual period." (Emphasis added.) Dr. Floyd argues this language is beyond the understanding of a layperson. We disagree. The manufacturer's instructions regarding the administration of Depo-Provera are clear and require little knowledge of technical terminology. As Plaintiffs note in their brief, although questions regarding the appropriateness or correct dosage of Depo-Provera to treat symptoms could very well involve complex medical issues, the timing of the administration to premenopausal females presents a simple straight forward inquiry. The manufacturer's label instructs that the medication should not be prescribed "to a woman of child-bearing potential after the fifth day of her menstrual cycle." Dr. Floyd does not contend that the administration of Depo-Provera to a pregnant woman is medically advisable contrary to the manufacturer's label; or, in this instance, Mrs. Terrebonne's health risks were so great and life threatening that using the drug was the only reasonable alternative.
Dr. Floyd candidly admits in brief on September 1st and 2nd, when he ordered the urine pregnancy tests to determine whether Rachel was pregnant, he knew "[t]he pregnancy was not sufficiently advanced to produce a positive pregnancy test at that time." Whether Dr. Floyd violated the standard of care by relying on the results of a test he admittedly knew may have been false and then administering Depo-Provera contrary to the manufacturer's label are issues well within a lay jury's grasp.
*763 Plaintiffs also cited a number of cases from other jurisdictions in support of their position. In Mulder v. Parke Davis & Co., 288 Minn. 332, 339-340, 181 N.W.2d 882, 887 (1970) the Minnesota Supreme Court stated "[w]here a drug manufacturer recommends to the medical profession (1) the conditions under which its drug should be prescribed; (2) the disorders it is designed to relieve; (3) the precautionary measures which should be observed; and (4) warns of the dangers which are inherent in its use, a doctor's deviation from such recommendations is prima facie evidence of negligence if there is competent medical testimony that his patient's injury or death resulted from the doctor's failure to adhere to the recommendations." The Mississippi Supreme Court in Thompson v. Carter, 518 So.2d 609 (Miss.1987) held that information contained in package inserts and the Physician's Desk Reference constituted prima facie proof of the proper use of a drug and a deviation from established negligence unless rebutted by a physician.
Although this case may present the first instance in Louisiana where a plaintiff seeks to rely solely on an admitted deviation from the manufacturer's specific warning to establish the standard of care owed, the Louisiana Supreme Court's holding in Pfiffner and the jurisprudence referenced by plaintiffs soundly points in favor of considering such evidence sufficient to make a prima facie showing of negligence. In any event, whether plaintiffs may use the evidence they intend to offer as prima facie proof of Dr. Floyd's negligence is itself a matter seriously unresolved; and the granting of summary judgment under the circumstances was inappropriate. Costs of this appeal are assessed to defendant-appellee, Dr. John Floyd.
REVERSED.
WOODARD, J., concurs in result.