783 So.2d 439 (2001)
Alicia FOURNET
v.
Criss M. ROULE-GRAHAM, M.D.
No. 00-CA-1653.
Court of Appeal of Louisiana, Fifth Circuit.
March 14, 2001.
Writ Denied June 15, 2001.
*440 A. Remy Fransen, Jr., Christopher J. Fransen, Fransen & Hardin, New Orleans, Counsel for plaintiff-appellee.
Margaret Bradley, Law Offices of Robert E. Birtel, Metairie, Counsel for defendant-appellant.
Court composed of Judges JAMES L. CANNELLA, CLARENCE E. McMANUS and PHILIP C. CIACCIO, Pro Tempore.
McMANUS, J.
This is a medical malpractice case brought by the Plaintiff, Alicia Fournet, against the Defendant and Appellant herein, Criss Roule-Graham, M.D. Ms. Fournet claims that Dr. Graham was negligent in prescribing Provera to her when this drug is contraindicated for patients with Ms. Fournet's medical history. For the reasons that follow, we find that the trial court was correct in rendering a judgment in favor of Ms. Fournet.

STATEMENT OF THE CASE
Ms. Fournet filed a claim for medical malpractice with the Patients' Compensation Fund against Dr. Graham, an OB/ GYN. Thereafter, a Medical Review Panel comprised of three OB/GYNs convened on April 23, 1998. The Panel concluded that Dr. Graham met the applicable standard of care in prescribing Provera to Ms. Fournet.
On May 1, 1998, Ms. Fournet filed a Petition for Damages alleging that Dr. Graham was negligent in prescribing Provera and negligent in failing to obtain fully informed consent. After a two-day bench trial, the trial court rendered a verdict in favor of the Plaintiff, and awarded her damages in the amount of one-hundred fifty thousand ($150,000) dollars. Dr. Graham then filed this appeal.

FACTS
Ms. Fournet has suffered through a long history of deep vein thrombosis (DVT), a *441 thromboembolitic disease that leads to excessive blood clotting. It is a disease that is very rare in someone as young as Ms. Fournet. Even more rare, however, was the cause of this condition. In 1988, her medical problems began with a deep vein thrombosis of the left thigh caused by a combination estrogen/progesterone birth control pill. She was hospitalized as a result, and discontinued any further use of hormone pills. The statistical probability of birth control pills causing deep vein thrombosis is very small. Nevertheless, Ms. Fournet continued to suffer from deep vein thrombosis, and had other occurrences of blood clots since then. Ms. Fournet began treatment by Claude C. Craighead, III., M.D., a vascular surgeon. Vascular surgeons specialize in the treatment of thromboembolitic disorders. Dr. Craighead started her on Coumadin, a blood thinner, and she continues this treatment today.
On September 30, 1996, Ms. Fournet first met with Dr. Graham concerning a suspected pregnancy. A test confirmed that she was pregnant, and Dr. Graham advised Ms. Fournet to discontinue using Coumadin during the pregnancy because Coumadin is associated with birth defects. Ms. Fournet told Dr. Graham that if there is any length of time that she is not on blood thinners, then she will get a blood clot. Ms. Fournet asked whether her treating physician, Dr. Craighead, should be contacted. Dr. Graham's response was "no, I think you'll be okay."
Less than three days later, Ms. Fournet suffered a blood clot that left her bedridden for ten days. It was later determined that Ms. Fournet's pregnancy was not viable, and she underwent a dilation and curettage operation. As it is termed, this missed abortion was unrelated to Ms. Fournet's deep vein thrombosis. In February of 1997, Ms. Fournet returned to Dr. Graham, this time for a condition known as abnormal uterine bleeding. Ms. Fournet reported to Dr. Graham that she was experiencing a three-week long menstrual cycle.
Dr. Graham decided at this point to put Ms. Fournet on a progesterone pill and prescribed 10mg of Provera for ten days. Provera is a synthetic progesteronea hormone pill. It acts by causing the excess lining of the uterus to shed so that the lining can stabilize itself and stop bleeding. Provera is normally prescribed by OB/ GYNs to stop abnormal uterine bleeding.
However, there is a contraindication in the Physician's Desk Reference (PDR) for using Provera with a patient that has a history of thromboembolitic disorders such as deep vein thrombosis. The PDR is a compilation of package inserts that has been officially approved by the Food and Drug Administration. All package inserts for prescription drugs must be approved by the FDA. A contraindication means it is inadvisable to prescribe a particular drug when a patient suffers from one or more enumerated conditions.
Ms. Fournet asked Dr. Graham if it would be advisable to take a hormone pill such as Provera. Her exact words were "I'm not supposed to take hormone pills." Again Ms. Fournet asked if she should check with Dr. Craighead. Dr. Graham responded, "no, you'll be okay."
Ms. Fournet took Provera, and soon thereafter developed another more severe blood clot. This blood clot required her hospitalization for ten days, along with an operation to insert a device known as a Greenfield Filter. This particular blood clot was of such severity and in such a location as to be potentially fatal without the operation.
The trial court made the following findings in its decision:

*442 1) The Plaintiff has proved the degree of care ordinarily exercised by physicians licensed in the State of Louisiana and in this particular medical specialty.
2) The Defendant failed to use reasonable care and diligence, along with her best judgment in the application of that skill.
3) As a result of the failure to exercise this degree of care, the Plaintiff suffered injuries that would not have otherwise occurred.

ASSIGNMENT OF ERROR NUMBER ONE
As her first assignment of error, Dr. Graham argues that Ms. Fournet failed to prove that she breached the standard of care for an OB/GYN. Dr. Graham argues that the trial court erred in basing its decision solely on the contraindications contained in the PDR for Provera. The material relating to Provera contained in the 1997 PDR indicated as follows:
Contraindications: 1)thrombophlebetis [thrombophlebitis], thromboembolic disorders.... or patients with a past history of these conditions.
Despite this warning contained in the PDR, Dr. Graham testified that it is standard practice for OB/GYNs to prescribe Provera as the first line of treatment for abnormal uterine bleeding even if the patient has a known history of deep vein thrombosis. According to Dr. Graham, 70% of OB/GYNs nationwide would find no risk between the use of Provera and the development of deep vein thrombosis. This opinion, which was corroborated by the other OB/GYNs that testified for Dr. Graham, directly contradicts the warning issued in the PDR.
The plaintiff's burden of proof in a medical malpractice action against a physician is found in La. R.S. 9:2794(A), which provides that the plaintiff shall have the burden of proving: 1) the standard of care ordinarily practiced by physicians ... within the involved medical specialty; 2) that the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with her best judgment in the application of that skill; and 3) that as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
Our review is constrained by the manifest error standard, which demands that findings of fact by the trial court be given great deference and disturbed only when clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La. 1989). Furthermore, where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Canter v. Koehring, 283 So.2d 716 (La. 1973). A reviewing court will give great deference to findings of fact when medical experts express different views, judgments, and opinions on whether the standard of care was met in any given case. Gordon v. Louisiana State University Board of Supervisors, 27, 966 (La.App. 2 Cir. 3/1/96), 669 So.2d 736.
Upon review of the entire record, we see no manifest error in the trial court's finding that Dr. Graham failed to exercise reasonable care and diligence in her treatment of Ms. Fournet. It is clear from this case that there is a difference of *443 opinion within the OB/GYN medical specialty as to whether Provera poses an additional risk for patients with DVT.[1] We are cognizant of Dr. Graham's testimony that a majority of OB/GYNs would prescribe Provera to a patient that has a history of a thromboembolitic disorder such as DVT. However, we cannot ignore the fact that there is a source of information, the PDR, which definitively states that Provera should not have been prescribed for a patient with DVT.
In Terrebonne v. Floyd, 99-0766 (La. App.1 Cir. 5/23/00), 767 So.2d 758, a Medical Review Panel unanimously found that a physician did not breach the standard of care despite not heeding drug interaction warnings contained in the PDR. After the plaintiff filed suit, the defendant-physician filed a Motion for Summary Judgment arguing that the plaintiff could not prevail by relying solely on the PDR, without retaining an expert OB-GYN to establish the applicable standard of care. The trial court granted the motion. However, the First Circuit reversed the trial court on appeal and held:
Although this case may present the first instance in Louisiana where a plaintiff seeks to rely solely on an admitted deviation from the manufacturer's specific warning to establish the standard of care owed, the Louisiana Supreme Court's holding in Pfiffner and the jurisprudence referenced by plaintiffs soundly points in favor of considering such evidence sufficient to make a prima facie showing of negligence.
Unlike the plaintiff in Terrebonne, Ms. Fournet is not attempting to rely solely on the contraindication contained in the PDR to establish the standard of care. Nevertheless, Terrebonne is instructive here because it demonstrates that other courts have considered the PDR as an authoritative medical source in a medical malpractice case. In fact, the court in Terrebonne considered the PDR sufficient evidence on its own to establish the standard of care.
There is nothing in the record that persuades us that the PDR should be ignored for any reason. It may very well be the case that a majority of those OB/GYNs are simply unaware of this specific contraindication for Provera, or may simply ignore it. Nevertheless, we see nothing in the record that convinces us the OB/GYN community is correct and the PDR is wrong.
Rather, the particular facts of this case persuade us that the trial court was correct in concluding that Dr. Graham failed to exercise reasonable care and diligence. Ms. Fournet had a long history of clotting problems and episodes of DVT. This disease was actually caused by hormone pills containing Progesterone. Provera is a hormone pill containing Progesterone, and precisely because of the risk associated with this pill and DVT, it is contraindicated in the PDR.
Nowhere in the record is it disputed that Dr. Graham was unaware of Ms. Fournet's history of deep vein thrombosis. In fact, Ms. Fournet testified that she is careful to disclose her condition to all doctors she sees. We find it significant that Dr. Graham knew of Ms. Fournet's sensitivity to clotting not only from Ms. Fournet's repeated warnings but from the blood clot she developed when Dr. Graham took her *444 off the blood thinner, Coumadin. Nevertheless, Dr. Graham still proceeded to prescribe Provera a few months later to stop the abnormal uterine bleeding. We do not disagree that this is the standard treatment for normal patients with abnormal uterine bleeding. However, Ms. Fournet is not a normal OB/GYN patient. She suffers from a specific thromboembolitic disease, and Dr. Graham was aware of it, not just from Ms. Fournet's first blood clot, but from the repeated warnings and concerns voiced by Ms. Fournet to her.
As the trial judge pointed out in his reasons for judgment, "I was persuaded and rather impressed by the fact that this Plaintiff was particularly curious not only about the disease ...but the treatment thereof. So much so that she was keenly interested in any prescription relative to the treatment of that disease." The trial judge went on to state that he was also "keenly impressed by the fact that when questioned by this Plaintiff, there was something less than even a modest disclosure or discussion of what the options were." Finally, the trial judge noted that there was "an apparent mechanistic disdain for anything that FDA may have said about this particular drug; whether it appeared in the PDR, or came with the drug."
We also note that when faced with Ms. Fournet's known sensitivity to this disease, and the specific contraindication in the PDR, it seems that reasonable care and diligence would dictate contacting Dr. Craighead, who is Ms. Fournet's treating physician and is more familiar with thromboembolitic diseases. Dr. Graham stated at trial that what was contained in the PDR was of no consequence to her. She went on to add, "I was treating Dysfunctional Uterine Bleedingnot DVTand I was treating it with the standard medication." Again, no one disputes that this was standard treatment for a patient with abnormal uterine bleeding, but Ms. Fournet is not a standard patient. Dr. Graham was aware of Ms. Fournet's sensitivity to clotting as she developed a blood clot immediately after she was taken off of the Coumadin therapy. Additionally, a review of Ms. Fournet's medical history should have alerted Dr. Graham to this patient's special circumstances, or at least prompted her to contact Dr. Craighead. As Ms. Fournet's treating physician for DVT, Dr. Craighead was in the best position to determine how an exacerbation of the condition can be avoided. This is supported by the expert testimony of Robert M. Hogan, M.D., an OB/GYN, who testified that he would be hesitant about giving a patient with that history any kind of hormonal therapy, and added that if presented with this situation he would have consulted an internist or a vascular surgeon. For all of the above reasons, we see no manifest error in the trial court's finding that Dr. Graham failed to exercise reasonable care and diligence.

ASSIGNMENT OF ERROR NUMBER TWO
As her second assignment of error, Dr. Graham argues that Ms. Fournet failed to prove a lack of informed consent. Specifically, Dr. Graham argues that the trial court erred in finding that she failed to advise Ms. Fournet of the risk associated with Provera or alternative treatments available.
Under the Informed Consent Doctrine, where circumstances permit, the patient should be told the nature of the pertinent condition, the general nature of the proposed treatment, the risk involved in the proposed treatment, the risks of failing to undergo any treatment or procedure at all, and the risks of any alternative method of treatment. Boudoin v. Crawford & *445 Marshall, Ltd., 97-224 (La.App. 5 Cir. 1/14/98), 709 So.2d 798, citing LaCaze v. Collier, 434 So.2d 1039 (La.1983). In this case, Ms. Fournet expressly questioned Dr. Graham on the harm associated with her taking a hormone pill, especially in light of her thromboembolitic condition. Ms. Fournet asked Dr. Graham whether it would be wise to contact Dr. Craighead, her treating physician. To all of Ms. Fournet's inquiries, Dr. Graham summarily responded, "no, you'll be okay." It is clear from the record that Dr. Graham did not inform her of the risk involved in taking Provera, the contraindication contained in the PDR, nor of any alternative method of treatment.
Dr. Graham contends that there was no need to disclose any information about Provera because she does not believe that there is any risk in the use of Provera for a patient with DVT. In fact, both OB/ GYNs that testified for Dr. Graham stated that the use of Provera, even in a patient with DVT is considered risk-free. Thus, according to Dr. Graham, there was no risk associated with Provera and no need to disclose the contraindication or any alternative methods of treatment.
In Hondroulis v. Schumacher, 546 So.2d 466 (La.1989), the Louisiana Supreme Court held that to determine the materiality of the risk involved, the existence and the nature of the risk must first be determined along with the likelihood of its occurrence. Then, the trier of fact must determine whether a reasonable person in the patient's position would attach particular significance to that risk. Based on the two-pronged test outlined above, we see no error in the trial court's finding that Dr. Graham failed to obtain fully informed consent.
We recognize that according to Dr. Graham, the majority of OB/GYNs simply do not believe there is any risk of harm in prescribing Provera when a patient has DVT. Such an opinion directly contradicts the warnings in the PDR. As stated above, there is nothing in the record that convinces us the PDR is wrong and should not be relied on as an authoritative medical source. Furthermore, we believe a reasonable person in Ms. Fournet's position who suffers from DVT would indeed attach significance to a direct contraindication such as the one for Provera.
As noted by the trial court, Ms. Fournet was particularly curious not only about the disease, but about the treatment thereof. It is true that neither the degree of knowledge a patient possesses nor the concern expressed by the patient will alter the standard of care expected of a physician. However, these are significant in terms of obtaining fully informed consent. Ms. Fournet testified that there is no way she would have taken Provera had she known it could lead to another blood clot, or had she known it was contraindicated in the PDR for people who suffer from DVT.

ASSIGNMENT OF ERROR NUMBER THREE
As her third assignment of error, Dr. Graham argues that Ms. Fournet failed to prove that Provera was the medical cause of her deep vein thrombosis in February of 1997.
To prevail in a medical malpractice action against a physician, the plaintiff must establish not only that the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical specialty, but also that a causal relationship existed between the alleged negligent treatment and the injury sustained. Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991). Causation is a factual finding which should not be reversed on appeal absent manifest error. Id. Where it is equally plausible that the *446 injury occurred from another cause as from the defendant's negligence, liability cannot be imposed because the plaintiff has failed to prove it is more likely than not that the injury resulted from the defendant's negligence. Cangelosi v. Our Lady of the Lake Regional Medical Center, 564 So.2d 654 (La.1989).
During Ms. Fournet's hospital admission in February, 1997, she tested positive for Protein S deficiency and the Lupus anticoagulant. Both of these conditions present a predisposition for the development of coagulation problems. Dr. Graham argues that these conditions, in addition to her continuing problems with DVT, could be an explanation as to why Ms. Fournet suffered a blood clot.
The initial thromboembolitic attack in 1988 came about as a result of the innocent use of hormonal birth control pills. Ms. Fournet was thereafter instructed to avoid any other hormone pills forever. Within three days after Dr. Graham placed Ms. Fournet on Provera, which is a progesterone hormone pill, she suffered a blood clot. Dr. Hogan, an OB/GYN, testified that "once she got the drug, she got the DVT." We see no error in the trial court's finding that the administration of Provera was more likely than not the cause of Ms. Fournet's injuries.

CONCLUSION
Based on the foregoing, we see no manifest error in the trial court's finding that Dr. Graham failed to exercise reasonable care and diligence, and such failure led to Ms. Fournet's injuries. The judgment of the trial court is hereby affirmed.
AFFIRMED.
CANNELLA, J., concurs.
NOTES
[1] It appears from the record that the PDR is the only study available specifically done on Provera that discusses its effects on a patient with a history of DVT. There was conflicting testimony on the reliability of studies done on other Progesterone pills and injections, such as the Minni-Pill and Depo-Provera, and their interaction with DVT. However, there are significant differences between the three, particularly in the dosage and rates of absorption.