STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

12-1417


ROLAND ROBIN, ET AL.

VERSUS

RUSSELL HEBERT, ET AL.


**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 78,079
HONORABLE GERARD B. WATTIGNY, DISTRICT JUDGE

**********

JOHN D. SAUNDERS
JUDGE

**********

Court composed of John D. Saunders, Jimmie C. Peters, and Marc T. Amy, Judges.


AFFIRMED.


 Kenneth Winslow Benson  Jr.
Attorney at Law
9100 Bluebonnet Ctr. Bvd.,#300
Baton Rouge, LA 70809
(225) 293-7272
COUNSEL FOR DEFENDANTS/APPELLEES:
    Russell Hebert
    Boyer's Thrift Pharmacy, Inc.

**Nicholas Gachassin, Jr.**
**Gachassin Law Firm**
**P. O. Box 80369**
**Lafayette, LA 70598-0369**
**(337) 235-4576**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Dr. Mike Mounir**

**Jacques P. Soileau**
**Soileau Law Offices**
**P. O. Box 344**
**Breaux Bridge, LA 70517**
**(337) 332-4561**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
    **Roland Robin**
    **Carolyn Serrette**

**Julie Savoy**
**Gachassin Law Firm**
**P. O. Box 80369**
**Lafayette, LA 70598-0369**
**(337) 235-4576**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Dr. Mike Mounir**

**SAUNDERS, J.**

This case involves an action by the children of decedent against a cardiologist and pharmacist/pharmacy after decedent was found unresponsive due to an apparent drug overdose. The trial judge dismissed the pharmacist/pharmacy on an exception of prescription and granted the cardiologist's motion for summary judgment. Children-Plaintiffs appeal. We affirm.

## FACTS AND PROCEDURAL HISTORY

On August 29, 2009, Betty Robin ("Robin") was found by her family unresponsive in her home. Her family immediately brought her to the emergency room ("ER") for treatment. A urine test was performed and it was found to be positive for the presence of benzodiazepine, a class of medications which includes Xanax. Xanax had been prescribed to Robin by her cardiologist, Dr. Mike Mounir ("Dr. Mounir"), and filled by Boyer's Thrift Pharmacy, Inc. ("Boyer's"). Robin eventually died on September 3, 2009.

Robin became a patient of Dr. Mounir's in 2000, after being referred to him for an asymptomatic irregular heartbeat. At the time, she was seventy years old with a history of asthma, chronic obstructive pulmonary disease, adult onset diabetes, hypertension, and a systolic heart murmur. Dr. Mounir treated Robin for coronary artery disease and irregular heartbeat from 2000 through 2005. Dr. Mounir continued to treat Robin's cardiac issues until March 2006, when her medical records indicate she switched to another cardiologist.

Also in March 2006, Robin was diagnosed with breast cancer. She ultimately underwent chemotherapy and a right radical mastectomy. In spite of this treatment, her tumor returned in January 2007. Her surgeon and oncologist both reviewed Robin's list of medications and found multiple similar medications. They recommended that she would benefit from comprehensive medication

management by her primary care physician.  Medical records from March 2007 indicate she routinely filled prescriptions for multiple pain medications, multiple anti-anxiety medications, and an antidepressant, which were prescribed to her by several different physicians on an ongoing basis.

In December 2007, Robin underwent a left total mastectomy for breast cancer which had developed in her left breast.  She chose to forego the recommended chemotherapy treatment and requested anti-anxiety medication from her surgeon.  Her surgeon declined her request and recommended she have her primary care doctor manage her longstanding anxiety.

By February 2008, Robin was receiving prescriptions for Valium (anti-anxiety), clonazepam (anti-anxiety), and an antidepressant from an internist, as well as prescriptions for multiple pain medications from her cardiologist and oncologist.  In June 2008, she complained of fatigue to her oncologist, who noted Robin was taking double doses of several medications and had extra bottles of her prescription medications.

In July 2008, Robin contacted Dr. Mounir's office seeking a refill of a steroid that had been previously prescribed to her by an ER physician.  Dr. Mounir refused to provide the refill because it had been so long since he had treated her.  In August 2008, Robin switched to a new internist who continued to prescribe an anti-depressant, an anti-anxiety medication and a pain medication to her.  Also in August 2008, Robin's breast cancer metastasized to her right hip and she began to receive palliative radiation treatments.

On October 13, 2008, Robin returned to see Dr. Mounir after she was referred to him by her radiation oncologist for complaints of heart palpitations and shortness of breath.  Robin reported to Dr. Mounir that her current medication regime included several cardiac, anti-cholesterol, and diabetes medications.  No

mention was made of the anti-anxiety medication, anti-depressant, or the pain medications she was also taking. Dr. Mounir prescribed Robin a cardiac medication.

Through the remainder of 2008 into 2009, Robin continued to see her internist and oncologist, obtaining prescriptions for pain medications, anti-anxiety medications, and trying several different prescription anti-depressant medications. Robin saw Dr. Mounir again in April 2009, complaining of shortness of breath and a fast heartbeat. She reported that she was unable to tolerate the cardiac medication he had prescribed for her on the last visit due to her chronic respiratory problems. Dr. Mounir changed the cardiac medication and also prescribed Xanax, an anti-anxiety medication, to treat what he believed to be anxiety-induced tachycardia (fast heart beat). Robin did not mention that she was taking two other anti-anxiety medications (Valium and clonazepam).

Dr. Mounir wrote Robin a half-strength prescription of Xanax (0.5 milligrams), to be taken once a day, for thirty days, without refills. Robin filled the prescription at Boyer's that day. One month later, on May 26, 2009, Robin contacted Mounir's office to request a refill of the Xanax. Knowing Robin's breast cancer was metastatic and terminal, Dr. Mounir believed she was likely suffering from at least mild anxiety and depression and that her use of anti-anxiety medication was reasonable under the circumstances. He increased her Xanax dosage from once to twice daily and wrote a prescription that provided her with an initial fill and two refills.

Robin filled this new Xanax prescription the day it was provided at Boyer's, receiving sixty Xanax 0.5 milligram tablets for a thirty-day supply, with two refills remaining. On June 29, 2009, about a month later, Robin refilled the Xanax prescription at Boyer's, receiving sixty 0.5 milligram tablets, for another thirty-day

3

supply. Finally, on July 27, 2009, Robin attempted to obtain her last refill of Xanax. However, Boyer's did not have sixty 0.5 milligram tablets of Xanax in stock. Therefore, Robin was provided with a partial refill of thirty pills. The final thirty pills were provided to her in early August 2009.

On August 29, 2009, Robin was brought to the ER by her family, who complained she was over-medicated and stated that this had happened several times before.[1] While in the ER, Robin experienced a spike in her blood pressure, trouble breathing, a decrease in her mental status, and fluid in her lungs that was so severe that it required diuresis. The ER physician ordered a qualitative urine drug screen, which could not give a reading or indication of the amount or concentration of drugs in her urine, only whether or not certain drugs were present. The test was positive for the presence of benzodiazepine, the class of medications that includes Xanax. Thus, based on this positive drug screen and her family's reports of Robin's history, Robin's admitting diagnosis was listed as possible drug overdose, anemia, congestive heart failure, acute edema, and hypertension.

Robin's condition never improved. She was transferred into hospice care on September 2, 2009, and died on September 3, 2009. No autopsy was performed.

Robin's children, Roland Robin and Caroyln Serrette ("Plaintiffs"), instituted a medical review panel against Dr. Mounir on July 19, 2010. Plaintiffs asserted Dr. Mounir provided treatment to Robin from October 13, 2008, to August 29, 2009, and did not meet the applicable standard of care. They specifically

---

[1] On December 16, 2001, Robin was found lethargic and sedated. She was admitted to Lafayette General and it was determined that she had taken sixty tablets of Ultram (a pain medication) over a period of nine days. She was also found to be taking several other sedating medications at that time. The next day, Robin's daughter-in-law contacted one of Robin's physicians expressing concern that Robin was "doctor shopping to obtain narcotic pain medications." Additionally, following a breast biopsy in 2006, Robin was admitted to Lafayette General for fluid volume overload, shortness of breath, and altered mental status. Robin was noted at that time to be taking two anti-anxiety medications at the same time (clonazepam and Lexapro). Upon her discharge, she was referred to her primary care physician to address the management of her medications.

alleged Dr. Mounir was negligent in prescribing Xanax to Robin, prescribing the quantity in which he prescribed, and prescribing it in light of Robin's history. In March 2011, Plaintiffs amended their complaint of malpractice to add Boyer's; however, it was determined by the Patient Compensation Fund ("PCF") that the pharmacy was not a qualified care provider under the malpractice act and Boyer's was dismissed. On March 19, 2011, the Medical Review Panel ("the Panel"), which consisted of three cardiologists, rendered an opinion in favor of Dr. Mounir, finding that he did not breach any applicable standard of care in the treatment he provided Robin. The Panel specifically found that Dr. Mounir was not aware of Robin's purported suicidal ideations, that her cardiac conditions and metastatic breast cancer were both valid causes for mild anxiety and mild depression, and that the amount of Xanax prescribed was not excessive in number or quantity. Plaintiffs subsequently filed the instant suit against Boyer's and Boyer's owner, Russell Hebert ("Hebert"), on August 9, 2011.

On March 19, 2012, Boyer's and Hebert filed a peremptory exception of prescription. On April 17, 2012, Plaintiffs added Dr. Mounir as a defendant. Dr. Mounir filed a motion for summary judgment on May 31, 2012. A hearing was held on Dr. Mounir's motion for summary judgment and Boyer's/Hebert's exception of prescription on August 1, 2012. The trial court granted Hebert's/Boyer's exception of prescription and dismissed the action against them. The trial court also granted Dr. Mounir's motion for summary judgment as a matter of law after finding that Plaintiffs failed to meet their burden of creating a genuine issue of material fact due to the lack of an expert witness or report. Plaintiffs appeal.

**ASSIGNMENTS OF ERROR**

Plaintiffs set forth the following assignments of error:

5

1. The trial court erred in finding that an expert report as to Dr. Mounir's standard of care as a medical provider was necessary to avoid summary judgment.

2. The trial judge erred in finding that Boyer's was not a joint and/or solidary tortfeasor within the meaning of La.R.S. 40:1299.47(A)(2)(a).

## LAW AND ANALYSIS

**1.     Summary Judgment & the Medical Malpractice Claim**

To successfully defeat a properly-supported defense of motion for summary judgment, the medical malpractice claimant must show that he can meet his burden of proof at trial on every element of his claim. *Schultz v. Guoth*, 10-0343 (La. 1/19/11), 57 So.3d 1002.   Therefore, Plaintiffs must establish 1) the applicable standard of care for a cardiologist in prescribing Xanax to a patient like Robin, 2) that Dr. Mounir breached this applicable standard of care, and 3) that the breach was the cause of Plaintiffs' damages.

Plaintiffs argue they should be allowed to prove the applicable standard of care by relying on the product labeling for Xanax.   In support of this argument, Plaintiffs cite *Terrebonne v. Floyd*, 99-0766 (La.App. 1 Cir. 5/23/00), 767 So.2d 758.   In *Terrebonne*, the Louisiana First Circuit Court of Appeal held that the manufacturer's labeling on Depo-Provera could be used as evidence to the standard of care for the timing of the administration of the drug.   The Depo-Provera label contained very specific language as to when the drug should be administered—it could only be given during the first five days after onset of a woman's normal menstrual period.   The *Terrebonne* plaintiffs alleged that the doctor breached the standard of care when he prescribed Depo-Provera in the early weeks of plaintiff's pregnancy, in contravention of the precautions contained on the manufacturer's product labeling.

6

On a hearing of a motion for summary judgment instituted by the doctor, the plaintiffs argued that expert evidence was not necessary because the manufacturer's labeling information was sufficient to establish the standard of care. The trial court granted the doctor's summary judgment and the first circuit reversed, finding that the Depo-Provera labeling expressly provided instructions as to the timing of the administration of the drug. The labeling was clear and required little knowledge of technical terminology, as such there was a genuine issue of material fact which necessitated reversal of the summary judgment. The *Terrebonne* court further recognized that questions regarding the appropriateness and dosage of Depo-Provera could involve complex medical issues which could require an expert.

The *Terrebonne* decision was limited to instructions on timing of administration of the medication—an issue that did not require expert testimony. The court relied on Depo-Provera's express, clear and non-technical instructions as to timing to find that expert testimony was not necessary as to the applicable standard of care. The timing of the administration of Xanax is not the issue in this matter. Plaintiffs allege that Xanax was an inappropriate medication to have prescribed to Robin and it was prescribed in an inappropriate dosage. Those are precisely the kinds of issues *Terrebonne* recognized as complex medical issues that could require expert evidence.

In *Pfiffner v. Correa*, 94-924 (La. 10/17/94), 643 So.2d 1228, the Louisiana Supreme Court held that, in some instances, when the medical and factual issues are such that a lay jury could perceive negligence as well as any expert could, then expert testimony is not necessary for a plaintiff to meet this burden. *Pfiffner* listed several examples of when a medical expert may not be required and negligence may be inferred, such as when a physician does an obviously careless act, like

7

fracturing a leg during an exam, amputating the wrong limb, dropping a scalpel or acid on a patient, or leaving a sponge in a patient's body after surgery. *Pfiffner*, 643 So.2d at 1233-1234.

Contrary to *Pfiffner* and *Terrebonne*, this case presents complex medical issues that include a cardiologist's standard of care for medical decision-making, determining the appropriate medication to prescribe to a patient such as Robin, and clinical evidence of the actual cause of Robin's death. These are not the types of issues where a lay jury can infer negligence. Furthermore, in *Schultz*, the Louisiana Supreme Court found that to successfully defeat a defendant's properly supported motion for summary judgment, a plaintiff must show that they can meet their burden of proof as to every element of their claim. Causation is clearly articulated as a requirement to overcome summary judgment. The *Schultz* court, citing *Pfiffner*, recognized that even in cases where expert testimony is not required to show standard of care or breach to successfully overcome a defendant's motion for summary judgment, the plaintiff must also establish a causal nexus between defendant's actions and the injury alleged. *Schulz*, 57 So.3d at 1007, 1009-10. The record in this matter contains no evidence regarding the cause of Robin's death. Affirmative evidence must be presented to show there is a genuine issue for trial. *Wright v. Louisiana Power & Light*, 06-1181 (La. 3/9/07), 951 So.2d 1058.

Without any evidence as to the proper standard of care for Dr. Mounir, a breach of this standard of care, and causation, the trial court properly granted Dr. Mounir's summary judgment.

## 2.      Prescription & La.R.S. 40:1299.47(A)(2)(a)

Robin passed away on September 3, 2009. Plaintiffs filed a petition before the medical review panel against Dr. Mounir on July 6, 2010. Plaintiffs amended their petition and added Hebert/Boyer's to the medical malpractice action before

8

the medical review panel on July 7, 2011. Immediately thereafter, Plaintiffs were informed that Hebert and Boyer's were not qualified for the panel review. Plaintiffs then filed the present action against Hebert/Boyer's on August 9, 2011, almost two years following Robin's death.

Pharmacists are not listed among those health care providers covered by the special medical malpractice prescription statute, La.R.S. 9:5628. Therefore, as a delictual action, Plaintiffs' lawsuit is subject to liberative prescription of one year from the day that injury or damage is sustained unless prescription was suspended. La.Civ.Code art. 3492. Plaintiffs argue that prescription was suspended against Hebert and Boyer's under La.R.S. 1299.47(A)(2)(a) because Hebert/Boyer's are joint or solidary obligors with Dr. Mounir. Louisiana Revised Statutes 1299.47(A)(2)(a) (emphasis added),in pertinent part, states:

> The filing of the request for a review of a claim shall suspend the time within which suit must be instituted, in accordance with this Part, until ninety days following notification, by certified mail, as provided in Subsection J of this Section, to the claimant or his attorney of the issuance of the opinion by the medical review panel, in the case of those health care providers covered by this Part, or in the case of a health care provider against whom a claim has been filed under the provisions of this Part, but who has not qualified under this Part, until ninety days following notification by certified mail to the claimant or his attorney by the board that the health care provider is not covered by this Part. **The filing of a request for review of a claim shall suspend the running of prescription against all joint and solidary obligors, and all joint tortfeasors, including but not limited to health care providers, both qualified and not qualified, to the same extent that prescription is suspended against the party or parties that are the subject of the request for review**.

The statute lays out two time periods for which prescription is suspended for joint and solidary obligors: 1) ninety days following notification of the issuance of an opinion by the medical review panel for health care providers covered by the act,

9

or 2) ninety days following notification that the provider is a health care provider not covered by the act.[2]

In order for suspension of prescription to have occurred, Hebert/Boyer's must be jointly or solidarily negligent with Dr. Mounir. Obligors are solidary when each is "obliged to the same thing." *Williams v. Sewerage & Water Bd. of New Orleans*, 611 So.2d 1383, 1387 (La.1993), *quoting Hoefly v. Gov't Employees Ins. Co.*, 418 So.2d 575, 576 (La.1982). Furthermore, "[i]t is well-settled that joint tortfeasors are deemed solidary obligors even though their concurrent negligence results from different acts or breaches of different obligations." *Arabie v. Nw. Mining Corp.*, 567 So.2d 783, 785 (La.App. 3 Cir.), *writs denied*, 571 So.2d 656, 657. "[I]t is the coextensiveness of the obligations for the same debt, and not the source of liability, that determines the solidarity of the obligation." *Williams*, 611 So.2d at 1386, *quoting Narcise v. Cent. Gulf R.R. Co.*, 427 So.2d 1192, 1195 (La.1983). More specifically, parties are solidarily liable only to the extent they share coextensive liability to repair certain elements of the same damage. *Id.* Nonetheless, a party seeking to avoid prescription by claiming solidary liability between two or more parties bears the burden of proving that solidary relationship. *Caronna v. Curry*, 473 So.2d 355 (La.App. 5 Cir. 1985); *Lowe v. Rivers*, 448 So.2d 848 (La.App. 2 Cir.1984).

It has been established that Plaintiff's did not meet their burden in proving an applicable standard of care for Dr. Mounir, that this standard was breached, or that this breach caused the death of Robin. If one defendant that is timely sued is ultimately found not liable, then the filing of a suit does not interrupt prescription

---

[2] It is noted that Plaintiffs argue the correct filing time against Hebert/Boyer's is ninety days after the rendering of the decision on Dr. Mounir from the review panel, when in fact the proper filing time against Hebert/Boyer's was ninety days following Hebert/Boyer's dismissal as not being a provider covered by the Act. Nevertheless, Plaintiffs filed within ninety days of Hebert/Boyer's dismissal so this timeliness is not at issue.

against anyone else; this is because no joint or solidary obligation with other defendants can possibly exist if the named defendant has no liability to begin with. *See Renfroe v. State*, 01-1646 (La. 2/26/02), 809 So.2d 947. As such, Hebert/Boyer's, in filling the medication Dr. Mounir prescribed, cannot be linked with him as a joint or solidary obligor because the case against Dr. Mounir has fallen. Without an action against Dr. Mounir, there cannot be suspension of prescription against Hebert/Boyer's since there can be no joint/solidary obligors.

The trial court was not in error in its finding that Plaintiffs' action against Hebert/Boyer's was prescribed.

## CONCLUSION

The granting of Dr. Mounir's motion for summary judgment is affirmed as Plaintiffs did not meet their burden in proving the applicable standard of care on the part of Dr. Mounir, a breach of said standard of care, or a nexus between the breach and the death of Robin. Furthermore, Plaintiffs' claim against Hebert/Boyer's prescribed as Hebert/Boyer's are not a joint or solidary obligor with Dr. Mounir such that the medical review panel filing suspended prescription.

Costs of this appeal are assessed to Plaintiffs.

**AFFIRMED.**