# In the Iowa Supreme Court

No. 22–1317

Submitted September 11, 2024—Filed November 8, 2024

**S.K.,** a legally incapacitated minor by and
through his conservator, **Thomas T. Tarbox,**

Appellee,

vs.

**Obstetric & Gynecologic Associates of Iowa City and Coralville, P.C.,**

Appellant.

Appeal from the Iowa District Court for Johnson County, Kevin McKeever, judge.

An obstetrics clinic appeals an adverse judgment in a medical malpractice case. **Reversed and Remanded.**

May, J., delivered the opinion of the court, in which all participating justices joined. Christensen, C.J., filed a concurring opinion, in which Waterman, J., joined. Waterman, J., filed a concurring opinion, in which Christensen, C.J., and McDonald and McDermott, JJ., joined. Oxley, J., took no part in the consideration or decision of the case.

Troy L. Booher (argued) and Beth E. Kennedy of Zimmerman Booher, Salt Lake City, Utah, and Jennifer E. Rinden, Robert D. Houghton, Vincent S. Gies, and Nancy J. Penner of Shuttleworth & Ingersoll, PLC, Cedar Rapids, until withdrawal, for appellant.

Ryan G. Koopmans (argued) of Koopmans Law Group, LLC, Des Moines, for appellee.

**May, Justice.**

A baby was injured during labor, delivery, or both. The baby's conservator—the plaintiff here—alleges that the baby was injured because of negligence by the delivering doctor. Among other things, the plaintiff alleges that the doctor was negligent in using a Mityvac obstetrical vacuum delivery system (vacuum) to deliver the baby and that this negligence caused brain damage to the baby. The plaintiff also alleges that the doctor's employer, a clinic, should be liable for damages caused by the doctor's negligence.

A jury found in favor of the plaintiff and awarded substantial damages. In this appeal, the clinic argues that a new trial is required. Among other things, the clinic argues that the district court erred by admitting a package insert that came with the vacuum. The insert contains statements by the vacuum's manufacturer about when the vacuum should not be used. The insert also contains statements about harms that could result from using the vacuum. The clinic argues that Iowa's hearsay rule required exclusion of the insert.

We agree. The insert contains hearsay, and it does not fit one of our recognized exceptions. So admission of the insert violated our hearsay rule. And under our precedents, we presume that the erroneous admission of hearsay was prejudicial to the objecting party, the clinic. The plaintiff has not rebutted that presumption. Moreover, even if there were no presumption, we would still conclude that admission of the insert deprived the clinic of a fair trial. So we must reverse and remand for a new trial.

**I. Factual and Procedural Background.**

**A. The Birth.** S.K.'s mom (mom) became pregnant with her third child, S.K. Throughout her pregnancy, mom received prenatal care from Dr. Jill Goodman, M.D. (Dr. Goodman). Dr. Goodman was employed by a clinic called Obstetric & Gynecologic Associates of Iowa City and Coralville, P.C. (clinic).

On August 11, 2018, mom was admitted to Mercy Hospital, Iowa City (Mercy) with painful contractions. By August 11, her pregnancy had reached approximately thirty-nine and four-sevenths weeks gestation, or full term. And it is undisputed that prior to August 11, S.K.'s condition was unremarkable.

Mom's admission occurred at about 1 p.m. One of Mercy's registered nurses was assigned as mom's primary labor nurse. Dr. Goodman cared for mom while also caring for two other laboring mothers who were in other rooms.

At 3:50 p.m., mom's nurse called for Dr. Goodman. Dr. Goodman came to mom's bedside. Dr. Goodman made two attempts to deliver S.K. using forceps. Neither attempt was successful. Dr. Goodman then used a vacuum. After one pull of the vacuum, S.K. was delivered at 4:09 p.m.

During the process of labor and delivery, S.K.'s skull was fractured and S.K. suffered brain injury. S.K. spent the next forty-six days at the neonatal intensive care unit at the University of Iowa Stead Family Children's Hospital. S.K. continues to experience repercussions of his birth injuries—although, as will be explained, both the nature and cause of those injuries are hotly contested.

**B. This Lawsuit.** In 2019, S.K.'s conservator and parents filed this lawsuit against Mercy, the clinic, and Dr. Goodman. Prior to trial, S.K.'s parents' claims were dismissed. So we refer to S.K.'s conservator as the plaintiff.

Also prior to trial, the plaintiff dismissed the claims against Dr. Goodman. The case then proceeded to trial against Mercy and the clinic. The clinic's liability, if any, would be vicarious liability for Dr. Goodman's alleged negligence.

The trial was largely a battle of experts. The plaintiff's experts testified that negligence by Mercy and Dr. Goodman caused S.K. to suffer two kinds of brain damage. First, they opined, S.K. suffered *hypoxic ischemic* encephalopathy (HIE) prior to delivery. HIE is a kind of brain damage caused by a lack of blood and oxygen. According to the plaintiff's experts, S.K. suffered HIE because of failure

to address mom's low blood pressure as well as failure to deliver S.K. much earlier via cesarean section.

S.K. also suffered *traumatic* brain injury, the plaintiff's experts testified. This traumatic injury was caused in two ways. First, misuse of the forceps led to a fracture of S.K.'s skull and damage to S.K.'s brain. Then additional traumatic injury was caused by application of the vacuum.

As for S.K.'s future, the plaintiff's experts testified that S.K. is permanently disabled, both cognitively and physically. S.K. will require twenty-four-hour custodial care for the rest of his life. The plaintiff's experts calculated that S.K. would incur over $42 million in medical and custodial care expenses.

The defendants' case was almost the mirror image of the plaintiff's. Like the plaintiff, the defendants called several experts. But the defendants' experts expressed views that were largely the opposite of the plaintiff's experts'. For starters, the defendants' experts testified that S.K. suffered no HIE during labor or delivery. They also testified that Dr. Goodman's use of the forceps and vacuum was appropriate, not negligent. And they explained that S.K.'s skull fracture and hemorrhages were the result of maternal forces of labor, a natural occurrence.

As for S.K.'s future, the defendants' pediatric neurologist, Dr. Epstein, testified that S.K. would not need any custodial care. Dr. Epstein went on to predict that S.K. would walk independently, participate in activities like golf, and obtain "normal employment based on a normal education through college or beyond if need be." Indeed, Dr. Epstein believed S.K. could "go to graduate school" and then "do a job just like basically anybody else in this courtroom"—including Dr. Epstein's.

**C. The Verdict.** The jury found in the plaintiff's favor. The jury concluded that the clinic and Mercy were both negligent and that each defendant's negligence was a "cause of any item of damage" to the plaintiff. The jury also

found that 50% of the defendants' "combined negligence" should be assigned to each defendant. And the jury found that the following damages were "sustained by the Plaintiff" and "caused by a defendant's fault":

| | |
|---|---|
| "Future medical and/or custodial care expenses" | $42,203,818 |
| "Loss of future earning capacity" | $11,698,731 |
| "Past loss of function of the mind and/or body" | $1,050,000 |
| "Future loss of function of the mind and/or body" | $20,700,000 |
| "Past pain and suffering" | $1,050,000 |
| "Future pain and suffering" | $20,700,000 |
| Total | $97,402,549 |

The district court entered judgment accordingly. The clinic filed motions for new trial or remittitur, but the court denied them. This appeal followed.

**II. The Issues on Appeal.**

Now the clinic asks us to reverse the judgment and remand for new trial. The clinic argues that a new trial is required for several reasons, namely, (1) the district court erred in submitting specifications of negligence that lacked evidentiary support; (2) the district court abused its discretion through its wording of specifications of negligence; (3) the district court erred by admitting hearsay—the package insert that came with the vacuum used in S.K.'s delivery; (4) alternatively, the district court abused its discretion by admitting the package insert despite its unfairly prejudicial character; (5) the district court abused its discretion by failing to grant a mistrial in response to misconduct by the plaintiff's lead trial attorney, Geoffrey N. Fieger; and (6) the district court abused its discretion by failing to grant a new trial because the verdict was excessive. Alternatively, the clinic argues that if we decline to order a new trial, we should reduce the judgment against the clinic because of a settlement that was reached between the plaintiff and Mercy. *See generally* Iowa Code §§ 668.4–.7 (2018).

As mentioned, we conclude that the erroneous admission of the vacuum insert requires us to grant a new trial. So we need not address the other issues raised in the clinic's appellate brief. Rather, our discussion of the merits focuses on the vacuum insert.

### III. Motion to Reverse.

Before turning to the merits, however, we mention a procedural issue that the clinic raised by filing a motion to reverse with our court shortly before oral argument.

The clinic's motion is based on Iowa Code section 147.140. When a medical malpractice claim requires expert testimony to establish the standard of care or a breach, section 147.140 requires the plaintiff to serve a "certificate of merit affidavit" no later than "sixty days" after the filing of "the defendant's answer." *Id.* § 147.140(1)(*a*). In the certificate of merit affidavit, a qualified expert must certify "under . . . oath" that he or she is familiar with "the applicable standard of care" and that "the standard of care was breached by the health care provider named in the petition." *Id.* § 147.140(1)(*b*)(1)–(2). Subsection 147.140(6) states that "[f]ailure to substantially comply with" these requirements "shall result, upon motion, in dismissal with prejudice of each cause of action as to which expert witness testimony is necessary to establish a prima facie case." *Id.* § 147.140(6).

We have interpreted section 147.140 on several occasions. One of our most recent efforts, *Miller v. Catholic Health Initiatives-Iowa, Corp.*, is relevant here. 7 N.W.3d 367 (Iowa 2024). In *Miller*, the defendant-medical providers moved for dismissal of a medical malpractice case because the plaintiff's certificate of merit affidavit was not signed under oath. *Id.* at 371–72. The district court denied their motions but we granted interlocutory review. *Id.* at 372. Ultimately, we held that an expert's unsworn letter did not substantially comply with section 147.140's

requirement of a "certificate of merit affidavit" that is signed "under . . . oath." *Id.* at 373–77 (emphasis omitted) (quoting Iowa Code § 147.140). So we reversed the district court's denial of the medical providers' dispositive motions, and we remanded for dismissal of the plaintiff's claims. *Id.* at 377.

The clinic asks us to order a similar remand here. The clinic contends that although the plaintiff served certificate of merit affidavits during the district court case, and although they were signed by an expert, Dr. Brickner, those signatures were unsworn. And so, the clinic argues, just as in *Miller*, we should reverse and remand for dismissal of the plaintiff's claims.

The court unanimously rejects this argument. And the court unanimously concludes that the clinic's motion to reverse should be denied.

The court is divided, however, as to the correct basis for denying the clinic's motion. Four members of the court conclude that the clinic's motion should be denied based on waiver through litigation conduct. Their reasoning is explained in Justice Waterman's concurring opinion, which is joined by Chief Justice Christensen as well as Justices McDonald and McDermott.

Two members of the court—Justices Mansfield and May—conclude that the clinic's motion should be denied on error preservation grounds and without reaching the issue of waiver. They reason that *Miller* should be distinguished because, in that case, the medical providers challenged the certificate of merit affidavit in the district court by filing dispositive motions in that court. Then the district court ruled upon those challenges through an order denying the motions. Thus, in *Miller*, there was no doubt that error was preserved. *See, e.g., Tetzlaff v. Camp,* 715 N.W.2d 256, 258 (Iowa 2006) ("Because this argument was both raised and ruled upon by the district court, we find the issue was preserved for our review.").

This case is different. In this case, the clinic did not challenge the plaintiff's certificate of merit affidavit in the district court. As a result, the district court never ruled on any such challenge. Therefore, error was not preserved. And it is not our role to consider unpreserved issues for the first time on appeal. Iowa Const. art. V, § 4 ("The supreme court . . . shall constitute a court for the correction of errors at law . . . ."); Iowa Code § 602.4102(1) (same); *State v. Gomez Medina*, 7 N.W.3d 350, 355 (Iowa 2024) ("If an issue was never presented to the district court to rule on, and if the district court did not in fact rule on it, we lack any 'error' to correct."); *Plowman v. Fort Madison Cmty. Hosp.*, 896 N.W.2d 393, 413 (Iowa 2017) ("A supreme court is 'a court of review, not of first view.'" (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005))); *State v. Holbrook*, 261 N.W.2d 480, 482 (Iowa 1978) (en banc) ("We are a court of review, not a nisi prius court. We cannot 'review' an issue unless it was raised in the trial court."); *Harvey v. Miller*, 25 Iowa 219, 220–21 (1868) ("This court, in a law case, sits as a court for the correction of errors at law, and not to decide cases agreed or otherwise, as on original hearing.").

**IV. Merits.**

We now turn to the clinic's argument that the district court erred by admitting hearsay, namely, written statements in the package insert for the vacuum. Although we usually review evidentiary rulings for abuse of discretion, *State v. Canady*, 4 N.W.3d 661, 668 (Iowa 2024), we review rulings on hearsay objections for correction of errors at law, *State v. Flores*, 2 N.W.3d 287, 292 (Iowa 2024).

Note: Although the court is divided as to the proper basis for denying the clinic's motion to reverse (see part III, above), the court is united in our approach to the merits of the clinic's appeal. All six participating court members agree with the discussion presented here in part IV.

**A. Hearsay Generally.** Generally speaking, a statement is hearsay if two criteria are met: (1) the statement is made out of court, that is, outside of the "trial or hearing" at which the statement is offered, and (2) the statement is offered "into evidence to prove the truth of the matter asserted in the statement." Iowa R. Evid. 5.801(*c*); *accord* Thomas A. Mauet, Warren D. Wolfson & Jason Kreag, *Trial Evidence* § 6.3(2), at 133 (8th ed. 2024) ("Hearsay is an out-of-court statement that is offered for its truth. When an out-of-court statement is offered for any relevant purpose other than proving its truth, it is not hearsay."); *see also* Iowa R. Evid. 5.801(*d*) (removing some statements from the definition of hearsay).

The general rule is that "[h]earsay is not admissible." Iowa R. Evid. 5.802. But hearsay can be admitted if it "falls within one of the numerous exceptions to the hearsay rule." *State v. Veverka*, 938 N.W.2d 197, 199 (Iowa 2020). Importantly, though, the hearsay's proponent—the party who wants the hearsay to be admitted—bears the burden of showing that an exception applies. *State v. Smith*, 876 N.W.2d 180,189 (Iowa 2016).

**B. The Insert Contains Hearsay.** Applying these principles here, we start by asking whether the package insert contains hearsay. The clinic points to this "contraindications" language in the insert, which the plaintiff emphasized in closing argument:

**CONTRAINDICATIONS**

Do not initiate vacuum if any of the following conditions exist:

- Non-vertex positions (breech or transverse lie/position) or face or brow presentation

- Suspected cephalopelvic disproportion

- Previous scalp sampling

- Suspected macrosomia, or risk of shoulder dystocia

- Failed vacuum or forceps attempt

- Less than 34 weeks gestation

- Unengaged vertex

- Incompletely dilated cervix

- Need for active device rotation

- Suspected fetal bleeding abnormalities

The clinic also mentions this "adverse events" language in the insert, which identified various possible "fetal injuries" associated with use of the vacuum, and which the plaintiff also emphasized in closing argument:

**ADVERSE EVENTS**

**Fetal Injuries:** Head trauma, bruises, contusions, lacerations, scalp edema, skull fracture, cephalhematoma, subgaleal hematoma, subdural hemorrhage, parenchymal hemorrhage, intracranial hemorrhage, retinal hemorrhage.

We agree that this language is hearsay. It is the manufacturer's written statements about when the vacuum should not be used ("contraindications") and what harms could result from its use ("adverse events"). Those written statements were made outside of the "trial or hearing" at which they were offered. Iowa R. Evid. 5.801(*c*)(1). And those statements were offered by the plaintiff "to prove the truth of the matter asserted" in the statements. *Id.* r. 5.801(*c*)(2). They were offered to prove that the vacuum should not be used when any of the listed "contraindications" are present, particularly a "[f]ailed . . . forceps attempt," which allegedly happened here. And they were offered to prove that using the vacuum could cause the "adverse events" listed on the insert, several of which match up with injuries that S.K. allegedly suffered. So those statements fall within the definition of hearsay. *See Arnold v. Lee*, No. 05–0651, 2006 WL 1410161, at *1, *8 (Iowa Ct. App. May 24, 2006) (affirming district court's refusal to admit package insert as hearsay); *see also In re Richardson–Merrell,*

*Inc. "Bendectin" Prods. Liab. Litig.*, 624 F. Supp. 1212, 1232 (S.D. Ohio 1985) ("The [drug] warnings [on labels] are out-of-court statements offered to prove the truth of the matters asserted. . . . The warnings are in fact inadmissible hearsay."), *aff'd in part and vacated in part sub nom. Hoffman v. Merrell Dow Pharms., Inc.* (*In re Bendectin Litig.*), 857 F.2d 290 (6th Cir. 1988); *Drs. Co. v. Plummer*, 210 So. 3d 711, 718–19 (Fla. Dist. Ct. App. 2017) (holding the trial court erred by admitting a package insert for Levaquin and explaining that although statements in learned treatises, pamphlets, or other writings can be used "in cross-examination of an expert witness," they cannot be used "as substantive evidence" because "otherwise, an opposing party would be deprived of the opportunity to cross-examine or impeach the source of the statement"); *Zweig v. E.R. Squibb & Sons, Inc.*, 536 A.2d 1280, 1282 (N.J. Super. Ct. App. Div. 1988) (package insert for Delalutin was properly excluded as hearsay); *Saccone v. Gross*, 84 A.D.3d 1208, 1209 (N.Y. App. Div. 2011) ("The plaintiff was properly precluded from offering the Physicians' Desk Reference . . . into evidence because the proffered evidence constituted inadmissible hearsay.").

Because the package insert contained hearsay, it should not have been admitted unless it fit within a recognized exception. The plaintiff argues that the insert fits within two of those exceptions: (1) the residual exception and (2) the market reports exception. We address each in turn.

1. *The residual exception.* We start with the residual exception because it is the ground on which the district court admitted the insert. The residual exception appears in Iowa Rule of Evidence 5.807. The rule states in pertinent part:

> Under the following conditions, a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under [any other] hearsay exception [recognized in our rules]:

(1) The statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and

(2) It is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

*Id.* r. 5.807(*a*).

Our precedents say that the residual exception is to "be used very rarely." *Veverka*, 938 N.W.2d at 199 (quoting *State v. Brown*, 341 N.W.2d 10, 14 (Iowa 1983) (en banc)). It can apply only in "exceptional circumstances." *Id.* (quoting *Brown*, 341 N.W.2d at 14).

More particularly, our precedents permit the exception to apply only if the district court makes "five findings concerning the nature of the evidence: (1) trustworthiness; (2) materiality; (3) necessity; (4) notice; and (5) service of the interests of justice." *Id.* at 200 (quoting *State v. Weaver*, 554 N.W.2d 240, 247 (Iowa 1996), *overruled on other grounds by State v. Hallum*, 585 N.W.2d 249 (Iowa 1998), *vacated*, 527 U.S. 1001 (mem.) (1999)). And these five criteria "are not factors to be weighed" or balanced. *State v. Skahill*, 966 N.W.2d 1, 10 (Iowa 2021). Rather, they are five independent requirements, "set forth in the conjunctive." *Veverka*, 938 N.W.2d at 200 (quoting *Weaver*, 554 N.W.2d at 247). They are "designed to limit the exception and protect the overarching rule against hearsay." *Skahill*, 966 N.W.2d at 11. All five "must be satisfied." *Id.* at 10. If the proponent fails to satisfy any one of the five requirements, the exception does not apply. *Id.*

In this case, the clinic claims that the plaintiff has not satisfied the necessity requirement. Iowa courts have addressed this requirement on several occasions. *See Skahill*, 966 N.W.2d at 10–15; *Veverka*, 938 N.W.2d at 204 (citing cases). We have clarified that "necessity" is not meant in some "absolute sense."

*Skahill*, 966 N.W.2d at 11. Rather, consistent with the text of Iowa Rule of Evidence 5.807(*a*)(2), the necessity requirement is met if the hearsay evidence is "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Put another way, the necessity element "requires the hearsay evidence to be *superior* to other available evidence." *Skahill*, 966 N.W.2d at 13 (emphasis added). So if the hearsay is not "the best available evidence," the necessity requirement is not met. *Larez v. City of Los Angeles*, 946 F.2d 630, 644 (9th Cir. 1991) (applying identically worded federal rule) ("By requiring that 'the statement [be] more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts,' . . . [the necessity requirement in the identically worded federal rule] essentially creates a 'best evidence' requirement." (first alteration in original)).

We conclude that the necessity requirement is not met as to the package insert. The package insert itself says that its instructions are just "general guidelines" for using the vacuum. The package insert says nothing about the specific facts of this case. And so the insert was not superior to the testimony of the plaintiff's actual experts, who addressed the same general topics as the insert, but who provided superior evidence because (1) they could address the specific facts of S.K.'s birth and (2) they were subject to cross-examination. *See Skahill*, 966 N.W.2d at 13–14 ("[W]hen the same evidence is available through in-court testimony, hearsay statements are generally not necessary under the residual exception."); *see also Cisson v. C.R. Bard, Inc.* (*In re C.R. Bard, Inc., MDL. No. 2187, Pelvic Repair Sys. Prods. Liab. Litig.*), 810 F.3d 913, 925 (4th Cir. 2016) (applying the residual hearsay exception and concluding that a manufacturer's material safety data sheet was "hardly the best evidence available that polypropylene was potentially dangerous for human implantation" because that

issue "received substantial attention from both parties' experts who themselves relied on studies, reports, empirical evidence, and tissue sample slides evidencing [the plaintiff's] particular pathology").

Moreover, we are not convinced that the package insert is superior to other evidence that the plaintiff *could have* obtained "through reasonable efforts," as the rule requires. Iowa R. Evid. 5.807(*a*)(2). On this point, we find useful guidance in the Iowa Court of Appeals opinion in *Arnold v. Lee*. 2006 WL 1410161. There, as here, a medical negligence plaintiff sought to introduce a manufacturer's package insert under the residual exception. *See id.* at *1, *4–5. The district court found the insert was inadmissible and the court of appeals agreed. *Id.* at *4–5. Specifically, the court of appeals found that while the insert "may provide probative information," the plaintiff had "not shown the insert itself is necessary to her case." *Id.* at *4. For one thing, the court observed, a doctor had "testified to substantially the same information as was contained in the insert." *Id.* "Further," the court noted, the plaintiff "could have called a representative of the manufacturer to testify to its own cautions and concerns." *Id.* Likewise, we think the plaintiff here could have called a representative of the vacuum manufacturer to cover everything the insert addressed. And the live representative would have been superior to the insert because—unlike the insert—the representative could have been cross-examined. *Cf. Skahill*, 966 N.W.2d at 15 (child's recorded forensic interview was not superior to trial testimony where the child "could be (and was) cross-examined").

We acknowledge the plaintiff's argument that "it is not reasonable" to call a manufacturer's representative. But it is the plaintiff's burden to establish that the insert was the best evidence available "through reasonable efforts." Iowa R. Evid. 5.807(*a*)(2); *see also Smith*, 876 N.W.2d at 189 (burden). And the record does not show that a manufacturer's representative could not have been

available through reasonable efforts. For example, we find nothing in the record that shows unsuccessful efforts to obtain the testimony of a manufacturer's representative.

We also acknowledge the plaintiff's arguments that a medical device manufacturer's instructions are especially trustworthy because they must be submitted to the U.S. Food and Drug Administration (FDA). But the record does not show that the FDA ever *approved* of the insert or the vacuum. Nor does the record show any specifics about the actual FDA clearance process for this vacuum or its insert, such as what "class" the vacuum falls into for purposes of FDA regulation or whether the vacuum was considered substantially equivalent to a predicate device. *See* 21 U.S.C. § 360c (classification of devices); *Stamps v. Collagen Corp.*, 984 F.2d 1416, 1418–19 (5th Cir. 1993) (discussing the FDA's classification of medical devices and different requirements for each), *abrogated in part by Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996); *How to Find and Effectively Use Predicate Devices*, U.S. Food & Drug Admin. (Sept. 4, 2018), https://www.fda.gov/medical-devices/premarket-notification-510k/how-find-and-effectively-use-predicate-devices (discussing FDA approval process of a medical device using predicate devices).

More importantly, although trustworthiness is part of our residual-exception analysis, it is not the only part. Rather, as noted, trustworthiness is only one of five requirements, "each of which must be met separately." *Skahill*, 966 N.W.2d at 13. Trustworthiness alone does not satisfy the necessity requirement. *Id.* ("Yet, trustworthiness should not be equated with necessity.").

Finally, we acknowledge the plaintiff's point that some states view device manufacturer's directions as admissible evidence of the standard of care. But the cases cited by the plaintiff don't confront the hearsay issues that face us here. *See Thone v. Reg'l W. Med. Ctr.*, 745 N.W.2d 898 (Neb. 2008) (no discussion

of hearsay); *Mueller v. Mueller*, 221 N.W.2d 39 (S.D. 1974) (same);[1] *Richardson v. Miller*, 44 S.W.3d 1 (Tenn. Ct. App. 2000) (same). And although the cases cited by the plaintiff also collect a number of other cases, those collected cases generally don't discuss hearsay, either.[2] *See, e.g., Haught v. Maceluch*, 681 F.2d 291 (5th Cir. 1982) (no relevant discussion of hearsay); *Rodriguez v. Jackson*, 574 P.2d 481 (Ariz. Ct. App. 1977) (same); *Salgo v. Leland Stanford, Jr. Univ. Bd. of Trs.*, 317 P.2d 170 (Cal. Ct. App. 1957) (same); *Bowman v. Songer*, 820 P.2d 1110 (Colo. 1991) (en banc) (same); *Craft v. Peebles*, 893 P.2d 138 (Haw. 1995) (same); *Ohligschlager v. Proctor Cmty. Hosp.*, 303 N.E.2d 392 (Ill. 1973) (same); *Terrebonne v. Floyd*, 767 So. 2d 758 (La. Ct. App. 2000) (same); *Nolan v. Dillon*, 276 A.2d 36 (Md. 1971) (same); *Mulder v. Parke Davis & Co.*, 181 N.W.2d 882 (Minn. 1970) (same); *Bissett v. Renna*, 710 A.2d 404 (N.H. 1998) (same);

---

[1] *Mueller v. Mueller* was decided in 1974, before South Dakota adopted codified rules of evidence. *Compare* 221 N.W.2d 39, *with* 1979 S.D. Sess. Laws ch. 358 (originally codified at S.D. Codified Laws §§ 19-16-1 to -27 (1980), now codified at S.D. Codified Laws §§ 19-19-801 to -803 (2024)). Although *Mueller* mentions a common law prohibition on admitting "medical books or treatises . . . to prove the truth of statements therein contained," it does not address any modern hearsay rules or any relevant exceptions within those rules. 221 N.W.2d at 42.

[2] There are exceptions. One of the collected cases, *Spensieri v. Lasky*, categorized a physician's desk reference (PDR) as hearsay, and held that it could not, "by itself, establish the applicable standard of care for physicians who prescribe medications for their patients." 723 N.E.2d 544, 545, 547–49 (N.Y. 1999).

In another collected case, *Garvey v. O'Donoghue*, the court concluded that a PDR was not admissible for the truth of the matters asserted because it did not fit within the market reports exception. 530 A.2d 1141, 1145 (D.C. 1987). Even so, the court held that a PDR and a package insert were admissible for standard of care issues as well as physicians' notice of those documents' contents. *Id.* at 1146. It appears the court viewed these as nonhearsay uses. *See id.*

Conversely, another collected case, *Thompson v. Carter*, held that a PDR was admissible because it met Mississippi's version of the market reports exception. 518 So. 2d 609, 611–12 (Miss. 1987) (en banc). As we discuss in part IV.B.2 of this opinion, however, Iowa's market reports exception is limited to compilations of objective factual material. It does not apply to evaluative conclusions, such as a manufacturer's warnings. As we read the *Thompson* decision, Mississippi's market reports exception is not similarly limited. *See id.*

Finally, we mention *Morlino v. Medical Center of Ocean County*. 706 A.2d 721 (N.J. 1998). Although it does not appear that *Morlino* involved a hearsay objection, the court drew a comparison between PDRs and the treatises described in the learned treatise exception. *Id.* at 730. In the case before us, though, the learned treatise exception has not been raised. This makes sense because although that exception allows learned treatises to be "read into evidence," they may not be "received as . . . exhibit[s]." Iowa R. Evid. 5.803(18). So that exception could not justify admission of the insert *as an exhibit*.

*Grayson v. State*, 838 P.2d 546 (Okla. Civ. App. 1992) (same); *Ramon v. Farr*, 770 P.2d 131 (Utah 1989) (same), *overruled in part on other grounds by Miller v. Utah Dep't of Transp.*, 285 P.3d 1208 (Utah 2012). More importantly, none of these cases address Iowa's residual exception, its necessity requirement, or an equivalent requirement in another state's rules. So we do not find them especially relevant here.

Because the plaintiff has not shown that the necessity requirement is fulfilled, the plaintiff has not shown that the residual exception applies. The district court erred in admitting the insert on this basis.

2. *The market reports exception.* The plaintiff argues that even if the residual exception does not apply, we can still affirm the admission of the insert on alternative grounds. Specifically, the plaintiff suggests that we should affirm because the insert falls within the market reports exception. We disagree.

Iowa's market reports exception appears in Iowa Rule of Evidence 5.803(17). It permits the admission of these kinds of hearsay: "Market quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations." *Id.* The federal market reports exception is worded identically. *See* Fed. R. Evid. 803(17). Some other states also have identically worded exceptions. *See, e.g., Fedij v. State*, 186 N.E.3d 696, 701 (Ind. Ct. App. 2022) (discussing Indiana Evidence Rule 803(17)); *Lee v. Holoubek*, No. 06–15–00041–CV, 2016 WL 2609294, at *4–5 (Tex. App. May 6, 2016) (discussing Texas Rule of Evidence 803(17)).

Consistent with its wording, the market reports exception applies to documents that "recite established factual information" of the same sort as "market quotations," "lists," and "directories." *Cisson*, 810 F.3d at 924 ("The narrower terms listed by the rule—'market quotations, lists, directories'—are items that recite established factual information."). As one court put it, the

documents that fall within the exception are those that recite "relatively straightforward *objective facts.*" *White Indus., Inc. v. Cessna Aircraft Co.*, 611 F. Supp. 1049, 1069 (W.D. Mo. 1985). For instance, in *State v. Heuser*, we held that the label on certain Energizer batteries could be admitted to prove the objective fact that they were indeed "AA lithium batter[ies]," as the label proclaimed, and that the labels on certain over-the-counter cold medication could be admitted to prove the objective fact that the medication contained "pseudoephedrine hydrochloride," as the label proclaimed. 661 N.W.2d 157, 163–65 (Iowa 2003) (alteration in original); *accord Reemer v. State*, 835 N.E.2d 1005, 1008–09 (Ind. 2005) (citing *Heuser* and concluding that "labels of commercially marketed drugs are properly admitted into evidence under the exception provided by [Indiana] Evidence Rule 803(17) *to prove the composition of the drug*" (emphasis added)). Similarly, other courts have held that the exception allows admission of various compilations of objective facts such as "price lists, stock market and futures market quotations (published in newspapers of general circulation or specialty journals), . . . city and phone directories, mortality tables, registers of such things as animals and ships, and compilations of estimated value of commonly traded items like used cars, comic books, postage stamps, and similar items." 4 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 8:101, Westlaw (4th ed. Aug. 2023 database update) [hereinafter Mueller & Kirkpatrick, *Federal Evidence*] (footnotes omitted) (collecting cases).

But the exception does not apply to statements that go beyond the recitation of "relatively straightforward objective facts." 2 Broun et al., *McCormick on Evidence* § 321, at 587 (Robert P. Mosteller ed., 8th ed. 2020) [hereinafter *McCormick on Evidence*]. The exception does not apply to documents that "present evaluative conclusions." 4 Mueller & Kirkpatrick, *Federal Evidence* §

8:101. The exception does not apply to conclusions reached through analysis. *See City of Huntington v. AmerisourceBergen Drug Corp.*, Nos. 3:17–01362, 3:17–01665, 2021 WL 1382379, at \*4 (S.D. W. Va. Apr. 12, 2021). The exception applies to "compilations of data, not to narrative and potentially subjective assessments." *Bianco v. Globus Med., Inc.*, No. 2:12–CV–00147, 2014 WL 119285, at \*1 (E.D. Tex. Jan. 12, 2014) (collecting cases). The exception applies to "readily verifiable information such as telephone directories, price lists and the like," not to "statements that correctly can be classified as directions, opinions, suggestions, and recommendations." *Garvey v. O'Donoghue*, 530 A.2d 1141, 1145 (D.C. 1987); *accord Triple Crown Am., Inc. v. Biosynth AG*, No. CIV. A. 96–7476, 1999 WL 305342, at \*2 (E.D. Pa. May 14, 1999) ("[The exception] is limited to a published tabulation, compilation or collection of objective factual data . . . ."); *Go–Video, Inc. v. Matsushita Elec. Indus. Co.* (*In re Dual–Deck Video Cassette Recorder Antitrust Litig. (No. MDL–765)*), No. CIV 87–987 PHX, 1990 WL 126500, at \*4 (D. Ariz. July 25, 1990) ("The type of publications contemplated by Rule 803(17) are those which deal with compilations of objective facts not requiring for their statement, a subjective analysis of other facts.").

The Fourth Circuit's opinion in *Cisson v. C.R. Bard, Inc.* provides a useful example. 810 F.3d 913. A plaintiff suffered harm after being implanted with a medical device developed and marketed by the defendant. *Id.* at 917–18. The device included a material called polypropylene. *Id.* at 917. An expert testified that the plaintiff was harmed when her body attacked the polypropylene. *Id.* at 918–19. The trial court admitted a material safety data sheet (MSDS) that had been composed by the manufacturer of the polypropylene. *Id.* The MSDS included the manufacturer's "explicit warning that polypropylene should not be used in short- or long-term human implantations." *Id.* at 919. The trial court

ruled that although the MSDS was hearsay, it was admissible under the market reports exception. *Id.* at 923.

The Fourth Circuit disagreed. The court noted that as a textual matter, the exception is limited to "items that recite established factual information." *Id.* at 924. And while an MSDS "might contain similarly factual information," the plaintiff had sought to use "a portion of the MSDS that was not factual but rather operated as a warning and disclaimer of liability for the self-interested issuing party." *Id.* That warning "was an opinion" that the manufacturer "issued within the MSDS for self-interested reasons"—such as avoiding liability—"and it therefore bears no resemblance to the factual, list-type documents enumerated in Rule 803(17)." *Id.*

The same is true of the vacuum insert here. While the insert contains some established factual information, that is not why it was admitted. Rather, the insert was admitted for the warnings included in the insert by the vacuum's manufacturer—the "contraindications" and "adverse events." Like the warnings in an MSDS, those warnings in the insert are based on the manufacturer's evaluation process which—naturally—may include its desire to avoid liability. *See Arnold*, 2006 WL 1410161, at *4 ("[T]he manufacturer has its own reasons for the information contained in the package inserts."); *see also Francisco v. Affiliated Urologists, Ltd.*, 553 P.3d 867, 875–76 (Ariz. 2024) (noting various limitations with respect to package inserts, including that manufacturers write them to attempt to limit liability, that language in inserts is not intended to preclude physicians from using their best judgment in patient care, and that the language is written for the medical profession, not laypeople).

In any event, those warnings aren't the sort of "relatively straightforward objective facts" that would fall within the exception. 2 *McCormick on Evidence* § 321, at 587; *accord Garvey*, 530 A.2d at 1145 (holding that pages of a PDR

were not admissible under Federal Rule of Evidence 803(17) because, although the PDR includes factual statements, "interwoven among its factual statements are statements that correctly can be classified as directions, opinions, suggestions, and recommendations"). *Contra Thompson v. Carter*, 518 So. 2d 609, 611–12 (Miss. 1987) (en banc); *Daniels v. Northcoast Anesthesia Providers, Inc.*, 120 N.E.3d 52, 60 (Ohio Ct. App. 2018) (en banc) (concluding PDR was admissible under Ohio's version of Rule 803(17) but conceding that "[s]everal courts have refused to admit the PDR and similar materials into evidence under" similar rules and citing *Garvey*, 530 A.2d 1141, *Kahanek v. Rogers*, 12 S.W.3d 501, 504 (Tex. App. 1999), and *In re Richardson–Merrell*, 624 F. Supp. at 1232).

**C. Prejudice.** Because the insert contains hearsay, and because no exception applies, we must conclude that its admission was erroneous. The next question is whether its erroneous admission was prejudicial. If so, we must grant a new trial. *See, e.g., State v. Jackson*, 4 N.W.3d 298, 312–13 (Iowa 2024); *Hawkins v. Grinnell Reg'l Med. Ctr.*, 929 N.W.2d 261, 265–67 (Iowa 2019).

Importantly, our precedents hold that when hearsay is improperly admitted, we must presume that the error was prejudicial. *See Hawkins*, 929 N.W.2d at 266. This presumption can be overcome if "the contrary is affirmatively established." *Id.* (quoting *State v. Nims*, 357 N.W.2d 608, 609 (Iowa 1984) (en banc)). "The contrary is affirmatively established if the record shows the hearsay evidence did not affect the jury's finding[s in its verdict]." *Id.* (alteration in original) (quoting *State v. Elliott*, 806 N.W.2d 660, 669 (Iowa 2011)).

The plaintiff argues that the presumption is overcome for three related reasons: (1) the insert was merely cumulative, (2) the insert was effectively irrelevant, and (3) the plaintiff's evidence was overwhelming. We address each contention in turn. We also address the clinic's arguments that—even placing

aside the presumption of prejudice—the record affirmatively establishes that the erroneous admission was prejudicial.

1. *Cumulative evidence.* We begin with the plaintiff's contention that the insert is merely cumulative of testimony provided by experts. As the plaintiff notes, there was testimony that sequential use of a vacuum extractor and forceps increases risk to the child. As support for this view, experts quoted or paraphrased certain published medical sources: a practice bulletin from the American College of Obstetrics and Gynecology, a study in the New England Journal of Medicine, and articles in the American Journal of Obstetrics and Gynecology and the European Journal of Obstetrics and Gynecology. "With the introduction of these medical journals," the plaintiff argues, "it is hard to see how the [clinic] was prejudiced by the introduction of the package-insert warning."

We disagree. To begin with, *the content* of this journal testimony was not the same as the insert's content. The journal testimony merely told the jury that the sequential use of forceps and a vacuum created increased risks. But the journal testimony did not convey to the jury that there was any absolute prohibition against sequential use. Conversely, the insert *did* convey an absolute prohibition. The insert said "[d]o not" use the vacuum if there has been a prior failed forceps attempt. The plaintiff emphasized this point in closing argument.

Moreover, no medical journals were *introduced* in the same way that the insert was. The journals were only *discussed.* No journal was *admitted* into evidence as a physical exhibit. No journal went back with the jury. The insert, however, was admitted as a physical exhibit. It actually went back to the jury room with the jury—another point that the plaintiff emphasized in closing argument. So the insert was a qualitatively different—and, arguably, a more powerful—kind of evidence. *Cf. Skahill,* 966 N.W.2d at 16 ("Forensic interviews

can be different from and, sometimes, more powerful than trial testimony."). And so, even if the content of the journal testimony had matched the insert's content, we would still hesitate to conclude that the insert's admission made no difference.

2. *Irrelevance.* Next the plaintiff raises two kinds of relevance arguments. First, the plaintiff suggests that because Dr. Goodman claims she did not actually "use the forceps because they did not lock," there was no "failed forceps attempt," and so "the literal terms of the package-insert warning did not apply." Therefore, the plaintiff implies, the insert was irrelevant to the jury's deliberations.

We disagree. The *plaintiff* offered extensive argument and evidence that Dr. Goodman attempted to use the forceps twice. Indeed, according to the plaintiff, one of those attempts fractured S.K.'s skull. But neither forceps attempt resulted in S.K.'s delivery. A jury could surely infer that—in the words of the insert—there *had* indeed been a "[f]ailed vacuum or forceps attempt." And so the jury could infer that the insert's prohibition was directly relevant.

The plaintiff also suggests that the jury's large award of damages for lifelong attendant care is a signal that the jury believed S.K. suffered severe cognitive damages from HIE "before Dr. Goodman even reached for the vacuum or the forceps." It follows, the plaintiff says, that the vacuum simply wasn't relevant.

We cannot agree. The verdict form did not separate damages caused by HIE from damages caused by traumatic injury, i.e., the kind of injury allegedly caused by the vacuum.

The plaintiff's evidence did not separate them either. Although the plaintiff admitted detailed calculations of S.K.'s future medical expenses and lost income,

neither calculation shows what damages were caused by HIE and what damages were caused by traumatic injury.

Nor does the plaintiff's medical evidence help us to draw clear lines. Consider the testimony of Dr. Gabriel, the plaintiff's pediatric neurologist expert. Dr. Gabriel testified that although HIE was a very important cause of S.K.'s anticipated cognitive disabilities, the "great deal of hemorrhaging and mechanical trauma" that S.K.'s brain experienced "is also a contributory factor to [S.K.'s] significant delay in intelligence" and "his behavior." "So it's not possible to discern completely between the mechanical trauma and the ischemia in this regard." And, as explained, the vacuum was among the alleged causes of S.K.'s traumatic brain injury. So we cannot say that the vacuum played no role in the jury's damage award.

3. *Overwhelming evidence.* The plaintiff also points to cases in which we have found that hearsay wasn't prejudicial because other evidence was "overwhelming." The plaintiff says that this principle applies because "the evidence that S.K. suffered HIE was overwhelming."

We disagree for two reasons. First, our "overwhelming evidence" rule means that the presumption of prejudice can be overcome by a showing that "there was overwhelming evidence on the issue for which the hearsay was introduced, making the prejudicial impact of the hearsay evidence insignificant." *Hawkins,* 929 N.W.2d at 266–67. But the hearsay at issue here—the vacuum insert—wasn't introduced to show that S.K. suffered HIE. Rather, it was introduced to show that he suffered *traumatic injury* via the vacuum.

Second, and in any event, while the plaintiff's case was strong, we cannot say that the plaintiff's HIE evidence was *overwhelming.* As mentioned, the whole trial was a battle of experts—and the defendants' experts certainly battled against the plaintiff's HIE theories. Dr. Friedrich "completely disagree[d]" with

the plaintiff's assertion that S.K. "experienced intrapartum hypoxia or oxygen deprivation during labor leading to HIE." And Dr. Epstein testified that S.K. "did not" experience HIE "during the labor and delivery process," as did Dr. Boyle. Similarly, Dr. Meyer testified that S.K.'s injury was "traumatic" and there "was no evidence of any hypoxic ischemic brain injury."

4. *Additional concerns.* For the reasons just explained, we conclude that the plaintiff has not rebutted the presumption of prejudice. Even if there were no presumption, though, we would still conclude that admission of the insert was prejudicial. Here are four reasons why.

First, as explained, this trial involved a strenuous contest about whether the vacuum should have been used and whether it caused harm to S.K. The insert was directly relevant to those questions. And "[w]hen inadmissible hearsay evidence directly addresses a hotly contested central dispute of the parties, it is harder for us to find the evidence nonprejudicial." *Skahill*, 966 N.W.2d at 16 (quoting *Hawkins*, 929 N.W.2d at 267).

Second, we agree with the clinic that *the origin* of the insert is significant. The insert was written by the manufacturer of the vacuum. Admission of the insert allowed the plaintiff to suggest that the manufacturer—a presumably neutral party—would not have approved of Dr. Goodman's use of the vacuum. This could well have led the jury to give substantial weight to the insert. *See* Mark Herrmann & Pearson Bownas, *Keeping the Label Out of the Case*, 103 Nw. U. L. Rev. Colloquy 477, 487–88 (2009) ("[P]ublic misconception and distrust about off-label use is common and deep-seated.").

Third, although the record did not establish that the FDA actually approved the insert, the jury heard suggestions—both in the plaintiff's opening statement and through comments by the plaintiff's experts—that the FDA had blessed the insert in some fashion. And courts have long recognized the danger

that juries will be unfairly influenced by findings of "purportedly unbiased" agencies, like the FDA, who are "cloaked" with a presumption of "governmental objectivity and expertise." *State v. Huston*, 825 N.W.2d 531, 537–38 (Iowa 2013) (quoting *EMK, Inc. v. Fed. Pac. Elec. Co.*, 677 F. Supp. 2d 334, 338 (D. Me. 2010)); *accord Gehl v. Soo Line R.R.*, 967 F.2d 1204, 1207–208 (8th Cir. 1992); *Vaughan v. Must, Inc.*, 542 N.W.2d 533, 542 (Iowa 1996).

Finally, closing arguments often help us decide whether evidence was prejudicial. *See, e.g., Skahill*, 966 N.W.2d at 17. In the closing argument here, the plaintiff put substantial emphasis on the insert, its presence among the physical exhibits ("Read it."), its categorical prohibitions ("Don't do it."), and the adverse events that the vacuum might cause. Here's an excerpt from the plaintiff's closing argument:

> The vacuum [insert] that says don't use it if there's a failed forceps delivery. Why? Because you may have injured the baby's skull and you will pull the blood into the brain and you will kill brain cells and you will cause a subgaleal hemorrhage, you'll cause a subdural hemorrhage, you'll cause -- let's look at the hemorrhages.
>
> Subarachnoid hemorrhage. Fracture of the parietal bone. Let me see some more hemorrhages here. Subgaleal hemorrhage. Subarachnoid hemorrhage. Facial nerve palsy. You got them all. They -- they literally, literally, in terms of the Mityvac -- where's the Mityvac?
>
> Read it. Go back in the jury room. He has every hemorrhage they warn about. Do not initiate the vacuum. These words are pretty clear. You don't have to be a doctor to know what they say, you can be a nurse. Failed vacuum or forceps attempt, don't do it. Don't do it. Don't do it. If you do it, here's what will happen and that's what happened.

Given these comments, as well as the other circumstances we've discussed, we cannot say that the vacuum insert had no impact on the verdict.

**V. Disposition.**

The court unanimously concludes that the clinic's motion to reverse should be denied. The court is divided on its reasoning for this denial. Four

members of the court conclude that the clinic's motion should be denied based on waiver through litigation conduct. Their reasoning is explained in Justice Waterman's concurring opinion, which is joined by Chief Justice Christensen and Justices McDonald and McDermott. Two members of the court, Justices Mansfield and May, conclude that the clinic's motion should be denied on error preservation grounds without reaching the issue of waiver, as explained in part III of this opinion.

As to the merits, the court unanimously agrees that a new trial is required for the reasons explained in part IV of this opinion. We reverse and remand on that basis.

**Reversed and Remanded.**

All justices concur except Oxley, J., who takes no part. Christensen, C.J., files a concurring opinion, in which Waterman, J., joins. Waterman, J., files a concurring opinion, in which Christensen, C.J., and McDonald and McDermott, JJ., join.

**Christensen, Chief Justice (concurring).**

I join the majority decision in full but write separately to address the misconduct committed by the plaintiff's counsel, Geoffrey Fieger, throughout trial, which prompted at least seven motions for a mistrial. Although the district court did not pronounce a mistrial based on Fieger's actions, his conduct was both uncivil and disrespectful to his opposing counsel and the presiding judge. Attorneys should treat opposing counsel and judges with basic decency while operating within the Iowa Rules of Professional Conduct. Fieger failed to accomplish either of these things during trial.

**I. Fieger's Behavior.**

Though the record is replete with examples, I will focus on what I consider to be the most egregious instances from closing argument only. I do so not to examine the merits of whether the district court should have granted the motions for mistrial but to denounce this type of behavior. As I have stressed before, attorneys who engage in uncivil and unprofessional behavior lower the bar for our profession. *See Iowa Sup. Ct. Att'y Disciplinary Bd. v. Rhinehart*, 953 N.W.2d 156, 173–74 (Iowa 2021) (Christensen, C.J., concurring specially). That's what happened here.

In this case, the district court properly instructed the jury to reach a verdict based only on the evidence presented during trial, the law reflected in the jury instructions, and the jury's reason and common sense. The jurors were also instructed to not allow personal sympathy, bias, prejudice, or emotion to influence their decision-making.

A proper closing argument will aid a jury in fulfilling these duties. "The single purpose of closing argument is to assist the jury in analyzing, evaluating and applying the evidence." *State v. Melk*, 543 N.W.2d 297, 301 (Iowa Ct. App.

1995). Closing arguments should focus on the law in the provided instructions, properly admitted evidence, and "permissible inferences which may reasonably flow from the record." *State v. Phillips*, 226 N.W.2d 16, 19 (Iowa 1975). Improper statements during closing argument may encourage the jury to stray from its task and "look beyond the facts and law to resolve the case." *Kinseth v. Weil-McLain*, 913 N.W.2d 55, 73 (Iowa 2018). Fieger's misconduct during closing argument may have encouraged the jury to do just that.

**A. Improper Vouching for Evidence.** Fieger improperly vouched for evidence throughout his closing argument. In general, "[c]ounsel has no right to create evidence by his or her arguments, nor may counsel interject personal beliefs into argument." *Rosenberger Enters., Inc. v. Ins. Serv. of Iowa*, 541 N.W.2d 904, 908 (Iowa Ct. App. 1995). "[C]ounsel may not during closing argument vouch for a witness's credibility based on personal belief, counsel's experience in similar cases, or any other ground outside the evidence at trial." *Buboltz v. Birusingh*, 962 N.W.2d 747, 759 (Iowa 2021) (citing *State v. Williams*, 334 N.W.2d 742, 744 (Iowa 1983)). Our Rules of Professional Conduct make this clear:

> A lawyer shall not:
>
> . . . .
>
> . . . in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant, or the guilt or innocence of an accused . . . .

Iowa R. of Prof'l Conduct 32:3.4(e). In comparison, an attorney may "argue the reasonable inferences and conclusions to be drawn from the evidence." *State v. Graves*, 668 N.W.2d 860, 874 (Iowa 2003) (citing *Phillips*, 226 N.W.2d at 19).

Fieger committed several instances of misconduct during closing argument that broke this basic rule:

- "And I can guarantee there's an absolute requirement that the records have to be truthful, and the records are."

- "And now, despite an avalanche of facts and proof -- and this is all I do. And I don't know how many more years I got in me. I've been doing this for nearly half a century. I'm in my seventh decade of life. But I think that -- I have not personally seen every case in the world, but this is certainly an interesting case in which the facts seem so unequivocal, so unanimous, the record is so voluminous."

- "[Dr. Goodman] just stood up here two minutes ago and said the heart rate was always fine. They'll say anything. They'll literally come up here, they've got a script . . . ."

Our court of appeals correctly held that similar improper vouching by counsel during closing argument required a new trial in *Bronner v. Reicks Farms, Inc.*, No. 17–0137, 2018 WL 2731618, at *1–2, *8 (Iowa Ct. App. June 6, 2018). When counsel engages in this kind of conduct during closing argument, it once again taints the jury's ability to do its job. In spite of Fieger's blatant attempt to do so, the jury cannot consider his personal opinions about the evidence or his past experience as an attorney when making its decision. The presentation of this information as evidence may distract the jury from the evidence and facts they should be considering. It is also unfair to opposing counsel, who rightfully did not make these arguments, as the jurors may believe opposing counsel lacks the same experience or belief in the evidence.

**B. Disparaging the Defense.** Fieger made several remarks throughout his closing argument that disparaged the defense and their arguments. "It is not the function of closing argument 'to debase, degrade or impugn the veracity of a litigant' or opposing counsel. Our system instead proceeds on the premise that counsel generally should focus on the merits of the case at hand, and that they can disagree about those merits without being disagreeable." *See Whittenburg v. Werner Enters. Inc.*, 561 F.3d 1122, 1130 (10th Cir. 2009) (citation omitted). For

example, we have held that a defense counsel's argument should not be referred to as a "smoke screen." *Graves*, 668 N.W.2d at 879.

Fieger made several comments during closing argument that disparaged the defense's remarks and insinuated that the arguments made were completely unfounded:

- "I told you the evidence that you heard and I kept my promise. And I kept my promise. And on the other side I got the most fantastical story that anybody could ever hear that in real life not one single doctor or hospital accepts as true."

- "By coming up with such preposterous defenses. It reveals, really, the total lack of a defense in this case, and the total lack -- an admission, really, of how bad it really is."

- "Now in real life, in real life here, here in this -- [S.K.'s] case, no one in real life, in realtime who has ever seen [S.K.] in life has ever accepted this nonsensical defense that's been offered in this case."

- "I don't like to give it lip service because when you start repeating a falsehood enough times, some people start to believe it. It's a method of propaganda, by the way."

- "And if you believe that, then I've got a bridge to sell you in Brooklyn."

Again, our court of appeals correctly concluded that similar remarks during closing argument disparaging defense counsel and witnesses warranted a new trial in *Bronner*, 2018 WL 2731618, at *1–2, *8. The examples above are just a sample of the disparaging remarks Fieger made about the defense's case. He routinely offered his personal opinions on the defense's arguments and mocked the idea that a jury could possibly find the defense truthful. This kind of rhetoric paints attorneys in a poor light. Attorneys may be zealous advocates while at the same time being respectful of the other side. Fieger's statements in his closing argument undermined the role of the defense in this trial and disrespected the counsel making the arguments.

**C. Punishment Arguments.** Lastly, perhaps the most egregious conduct occurred during closing argument when Fieger also improperly encouraged the jury to punish the defendants for failing to take responsibility for S.K.'s injuries. This court has held: "It is facially improper to suggest that a jury use a compensatory damages award, which is designed to recompense the plaintiff for actual harms suffered, to punish the defendant." *Kinseth*, 913 N.W.2d at 71. A closing argument should not be used to argue that the defendant "has chosen to spend exorbitant sums of money defending . . . actions instead of compensating innocent victims, and this case is an opportunity to tell them what you, the jury, think of that choice." *Id.* at 73.

"[T]he right to present a defense is materially identical to the right to pursue a lawsuit . . . ." *See Whittenburg*, 561 F.3d at 1129–30. "To imply or argue that the mere act of defending oneself . . . is reprehensible serves no proper purpose, and for time out of mind it has been the basis for appellate courts ordering new trials." *Id.* at 1130 (citing *N.Y. Cent. R. v. Johnson*, 279 U.S. 310, 318 (1929) ("Such a bitter and passionate attack on petitioner's conduct of the case, under circumstances tending to stir the resentment and arouse the prejudice of the jury, should have been promptly suppressed.")). Once again, these arguments improperly invite jurors to make decisions based on their biases or feelings, not the laws and facts.

Fieger engaged in several instances of misconduct during closing argument that violated this rule as well:

- "And I don't get to come up here anymore and I'm going to give his case to you and it's got to stop. This has got to stop now, what they've done, what they've put this family through for three and a half years by saying that black is white, up is down, day is night, all the doctors are wrong. It's time to take -- just responsibility. It's not so bad. Just take responsibility. They didn't. Now take responsibility."

- "And the only reason for that is if -- because if it is what they say, it's absolute negligence. It's indefensible. So they came up in a court of law in America in Iowa City in the year 2022, in March, with a fantastical explanation for the indefensible actions that they did."

- "And it's because the dollar is more important than admitting mistakes, admitting a violation of the standard of care, and doing what's right and taking responsibility for what you've done."

- "Dr. Goodman sat in this courtroom for three and a half weeks, but she, my estimation of the facts in this case, didn't have time to do what was correct under the standard of care . . . . But she's got all sorts of time to sit in here, because the only thing we're doing here is money. Money."

These statements encourage the jury to act outside their proscribed duties and punish the defendant. That is not at all the role of a juror. The role of a juror is to consider the law and facts of the case and, if applicable, award damages when a party has been legally harmed. A defendant is absolutely entitled to present a defense and aid the jury in reaching its decision. Fieger overstepped the bounds of a zealous advocate and asked the jurors to punish the defendant.

**II. Conclusion.**

Fieger's conduct throughout trial was unacceptable. He was admonished repeatedly by the judge for his statements. In spite of those admonishments and a long history of similar conduct in other states,[3] he continued to violate basic rules of professionalism and civility. His apologies ring hollow when he made no adjustments to his outlandish behavior.

---

[3]Fieger has a long history of misconduct. His home state's supreme court reversed a $21 million verdict based on his conduct and concluded, "Overreaching, prejudice-baiting rhetoric appears to be a calculated, routine feature of [Fieger's] trial strategy." *Gilbert v. DaimlerChrysler Corp.*, 685 N.W.2d 391, 406 (Mich. 2004) (reversing judgment on a jury verdict based on Fieger's misconduct and collecting examples of his misconduct in other cases). The Ohio Supreme Court affirmed an order vacating a $30 million verdict in a medical malpractice trial based on Fieger's misconduct. *Harris v. Mt. Sinai Med. Ctr.*, 876 N.E.2d 1201, 1207–08 (Ohio 2007). Fieger's admission pro hac vice has been revoked in several jurisdictions based on his pattern of misconduct and disciplinary history. *See Davis v. Marcotte*, 951 N.E.2d 117, 121–24 (Ohio Ct. App. 2011) (affirming revocation and collecting cases).

As I have noted, incivility and disrespect have damaging consequences for the attorney's reputation and the reputation of our court system. *See Rhinehart*, 953 N.W.2d at 173–74 (Christensen, C.J., concurring specially). It can also be costly, which is evident here based on the time and resources the parties have spent to litigate Fieger's conduct through numerous motions for mistrial in the district court and now on appeal, all the while risking a new trial and jeopardizing a substantial jury award for his own client. Fieger should consider himself lucky that our court need not reach a determination regarding his conduct because we are reversing this case on other grounds.

I've said it before and I will say it again: Our court should not be forced into the role of " 'kindergarten cop' and [referee] a dispute between attorneys caused by one who either never learned or has forgotten the basic good manners others learned before first grade." *Id.* at 172 (quoting *Saldana v. Kmart Corp.*, 84 F. Supp. 2d 629, 640 (D.V.I. 1999), *aff'd in part, rev'd in part*, 260 F.3d 228 (3d Cir. 2001)). This case should serve as a reminder to attorneys that their "conduct should be characterized at all times by personal courtesy and professional integrity in the fullest sense of those terms." Iowa Ct. R. 33.1(1).

Waterman, J., joins this concurrence.

**Waterman, Justice (concurring).**

I join the court's opinion in full. I write separately to address an issue certain to arise on remand: the clinic's renewed effort to dismiss this case with prejudice under Iowa Code section 147.140(6) (2018) based on S.K.'s expert's unsworn signature on certificate of merit affidavits served over four and a half years ago. As our court explains above, the clinic never raised this issue in district court and for that reason, failed to preserve error for this appeal. Our court therefore denied the clinic's appellate motion to reverse the judgment without reaching the merits of the section 147.140(6) issue. Because the clinic has made clear it will seek dismissal under that statute on remand, we should resolve the issue now. *See Jones v. Glenwood Golf Corp.*, 956 N.W.2d 138, 143 (Iowa 2021) (explaining why the court elected to decide an unpreserved, potentially dispositive issue that was certain to arise on remand).

In my view, the clinic impliedly waived its right to dismissal under section 147.140(6) by failing to raise the issue before final judgment, by the dispositive motion deadline, or indeed at any time during nearly four and a half years of litigation until its appellate motion to reverse. *See, e.g., LaLonde v. Gosnell*, 593 S.W.3d 212, 218–29 (Tex. 2019) (holding litigation conduct waived rights under a certificate of merit statute); *Mod. Piping, Inc. v. Blackhawk Automatic Sprinklers, Inc.*, 581 N.W.2d 616, 620–22 (Iowa 1998) (holding litigation conduct waived arbitration rights under Iowa Code section 679A.2), *overruled on other grounds by Wesley Ret. Servs., Inc. v. Hansen Lind Meyer, Inc.*, 594 N.W.2d 22 (Iowa 1999). Our court does not decide today the precise point at which a motion challenging a certificate of merit affidavit becomes untimely, but we have no trouble saying that it is too late once the district court issues its final judgment.

Iowa Code section 147.140(1)(*a*) requires the plaintiff to serve a certificate of merit affidavit "within sixty days of the defendant's answer." In *Miller v. Catholic Health Initiatives-Iowa, Corp.*, we applied the plain language of the statute to hold that the expert's unsworn signature on the certificate of merit affidavit did not substantially comply with Iowa Code section 147.140, which unambiguously requires the expert to sign "under oath." 7 N.W.3d 367, 374–75 (Iowa 2024). The purpose of the statute is to "enable[] healthcare providers to *quickly dismiss* professional negligence claims that are not supported by the requisite expert testimony." *Id.* at 374 (emphasis added) (quoting *Struck v. Mercy Health Servs.-Iowa Corp.*, 973 N.W.2d 533, 541 (Iowa 2022)). "Early disposition of potential nuisance[] cases, and those which must ultimately be dismissed for lack of expert testimony, would presumably have a positive impact on the cost and availability of medical services." *Struck*, 973 N.W.2d at 541 (alteration in original) (quoting *Hantsbarger v. Coffin*, 501 N.W.2d 501, 504 (Iowa 1993) (en banc)). That cost-avoidance purpose is thwarted when the defendant healthcare clinic waits until after the jury trial to challenge an unsworn signature.

Iowa Code section 147.140(6) allows dismissal only "upon motion" and is neither jurisdictional nor self-executing. The timeline in this case shows the clinic waited far too long to file a motion under section 147.140(6):

- July 1, 2017. Iowa Code section 147.140 became effective. *See* 2017 Iowa Acts ch. 107, § 5.

- August 11, 2018. S.K. was injured at birth allegedly due to the negligence of Dr. Goodman.

- November 22, 2019. This medical malpractice action was filed with three unsworn certificate of merit affidavits signed by Dr. Brickner.

- December 18, 2019. The clinic and Dr. Goodman filed their answer.

- **February 17, 2020**. The sixty-day deadline for a sworn certificate of merit affidavit expired without an agreed extension or order allowing additional time. The clinic did not file a motion under Iowa Code section 147.140(6) or otherwise challenge the unsworn signatures.

- August 11, 2020. Iowa Code section 614.1(9)(*a*)'s two-year statute of limitations expired for claims by S.K.'s parents brought under Iowa Rule of Civil Procedure 1.206.[4]

- **December 31, 2021**. The dispositive motion deadline expired without any motion by the clinic under Iowa Code section 147.140(6) for dismissal with prejudice.

- March 2022. The case was tried to a jury for three weeks, with S.K.'s experts testifying under oath that Dr. Goodman breached the standard of care. The clinic never raised the certificate of merit affidavit issue before, during, or after trial.

- August 5, 2022. The clinic appealed after the district court denied the final posttrial motion.

- May 2023. The clinic filed its final briefs without raising the certificate of merit affidavit issue.

- **July 31, 2024**. The clinic filed a motion to reverse the judgment, raising for the first time its argument that it is entitled to dismissal with prejudice under Iowa Code section 147.140(6) because S.K. did not serve a sworn certificate of merit affidavit by the statutory deadline of February 17, 2020.

The clinic argues it is entitled to summary reversal under *Miller* as a controlling and "indistinguishable recently published decision" of our court. *See* Iowa R. App. P. 6.1006(3). *Miller,* however, is easily distinguished from this case. In *Miller*, the defendants filed dispositive motions within three months of the deadline for the certificate of merit affidavits that were not signed under oath or penalty of perjury. *See* 7 N.W.3d at 371; *see also Shontz v. Mercy Med. Ctr.-Clinton, Inc.,* No. 23–0719, 2024 WL 2868931, at \*1–2 (Iowa June 7, 2024)

---

[4]The conservator's claims on behalf of the minor S.K. could have been filed as late as his tenth birthday, August 11, 2028. *See* Iowa Code § 614.1(9)(*b*).

(per curiam) (applying *Miller* and remanding for dismissal when defendants filed their dispositive motion under section 147.140(6) within thirty days after plaintiffs served unsworn certificate of merit affidavits). By contrast, here the clinic waited over four years and well after trial to challenge the unsworn signatures. *Miller* did not change the law on this issue. No Iowa appellate decision had previously held an expert's certificate of merit neither sworn nor signed under penalty of perjury substantially complied with the oath and affidavit requirements of section 147.140.[5] Nor had any Iowa appellate court allowed a medical defendant to raise the issue for the first time after trial or after the pretrial dispositive motion deadline.

The clinic could have filed its motion for dismissal with prejudice under Iowa Code section 147.140(6) challenging the unsworn certificate of merit affidavits in February of 2020 but waited over four years to raise the issue. During those years, the parties incurred significant litigation expenses, tried the case to verdict, and fully briefed all the other issues for the appeal. Under the reasoning of *LaLonde v. Gosnell* and *Modern Piping, Inc. v. Blackhawk Automatic*

---

[5]*Miller* simply enforced the statutory requirement that had been in effect since section 147.140's enactment in 2017. *See* 7 N.W.3d at 375 ("We are not at liberty to eliminate the requirement that the expert sign the certificate of merit under oath when the governing statute uses the term 'affidavit' six times. A contrary holding would undermine many Iowa statutes requiring sworn statements or verifications."). Prior to *Miller*, we noted section 147.140 "unambiguously requires that the expert witness personally sign the certificate of merit under oath within sixty days of the defendants' answer." *Est. of Fahrmann v. ABCM Corp.*, 999 N.W.2d 283, 287–88 (Iowa 2023) (holding counsel's signature on initial disclosures identifying the expert did not substantially comply with section 147.140). In *Jorgensen v. Smith*, we reiterated that the certificate of merit affidavit "must be signed under oath by an expert witness." 2 N.W.3d 868, 872 (Iowa 2024). In *Jorgensen*, the defendants challenged only the lack of any certificate of merit affidavit addressing the negligent retention claim against the physician's employer, *see id.*, and our holding addressed only that narrow issue, *see id.* at 877 ("[S]ection 147.140 does not apply to the Jorgensens' negligent retention claim"). The defendants' interlocutory appeal in *Jorgensen* did not challenge the sufficiency of the certificate of merit affidavit signed by the plaintiffs' expert supporting the malpractice claims against the physician himself. The statement in the opinion that this "affidavit was signed under oath" was unnecessary to our holding and was dictum. *See id.* at 872.

*Sprinklers, Inc.*, the clinic waived any challenge to the unsworn certificate of merit affidavits.

In *LaLonde*, homeowners hired engineers to evaluate and stabilize their home's foundation and alleged that the work of the engineers "exacerbated the foundation problems, causing significant damage to their home." 593 S.W.3d at 216–17. A Texas statute "requires that a sworn 'certificate of merit' accompany any lawsuit complaining about a licensed professional engineer's services." *Id.* at 216. "Failure to contemporaneously file an affidavit from a similarly licensed professional attesting to the lawsuit's merits requires dismissal of the suit." *Id.* The purpose of the statute is to help "ensure frivolous claims are expeditiously discharged." *Id.* The plaintiffs failed to file a certificate of merit, but the defendants waited over three years to raise the issue shortly before trial, after discovery and a failed mediation. *Id.* at 217. The trial court dismissed the action, but the court of appeals reversed, holding that the engineer defendants waived the certificate of merit requirement. *Id.* The Texas Supreme Court, applying a totality-of-the-circumstances test, held that waiver was established:

> No certificate of merit has ever been filed in this lawsuit, as required, but the defendant engineers did not seek dismissal until the eve of trial—1,219 days after suit was filed, nearly two years after the engineers answered, and long after the limitations periods had expired on the plaintiffs' claims. In the interim, the engineers participated in discovery until all discovery deadlines had expired, filed motions seeking to shift responsibility to third parties, and— rather than invoking the absolute statutory right to dismissal— chose to participate in alternative methods for terminating the lawsuit. As we affirmed in *Crosstex Energy Services, L.P. v. Pro Plus, Inc.*, [430 S.W.3d 384, 386, 393–95 (Tex. 2014)], a defendant can waive Chapter 150's certificate-of-merit requirement by litigating inconsistently with claiming the right to dismissal. Considering the totality of the circumstances, we agree with the court of appeals that the defendant engineers' engagement of the judicial process implies they intended to waive the statute's requirements.

*Id.* at 216 (footnote omitted).

The *LaLonde* court pointedly observed, "By enabling defendants to quickly jettison meritless lawsuits, the certificate-of-merit requirement saves parties the expense of protracted litigation." *Id.* at 220. And in applying its waiver analysis, the court recognized that "when defendants have so engaged the judicial process that a certificate of merit ceases to serve its intended function, the requirement of its filing is waived." *Id.* at 229. The same conclusion is inescapable here. The objective of Iowa's certificate of merit statute—early dismissal and resulting cost avoidance—is thwarted when the defendant waits until close to or after trial to seek dismissal.

The Texas statute has no deadline for filing a motion to dismiss. *Id.* at 220–21. The *LaLonde* court nevertheless held that the absence of a statutory deadline does not preclude an implied waiver by conduct. *Id.* at 221 ("Our precedents affirm that the absence of a deadline for asserting a right . . . does not preclude implied waiver by conduct inconsistent with claiming the right."). The clinic argues that the absence of a deadline in Iowa Code section 147.140(6) precludes a finding of waiver by litigation conduct. The clinic's no-deadline argument fails under *LaLonde*.

*LaLonde* aligns with Iowa precedent holding that parties can waive a right to arbitration under Iowa Code section 679A.2. *See Mod. Piping,* 581 N.W.2d at 619–20. In *Modern Piping,* we held that the defendant in that case waived its right to arbitrate a contract dispute by litigating in district court for eighteen months before moving to compel arbitration five days before trial. *Id.* at 621–22. Like the *LaLonde* court, we held that the defendant waived its right to arbitration despite the absence of any deadline in the arbitration statute. *See id.* at 619–22 (quoting Iowa Code section 679A.2). We concluded, "Conduct which allows an action to proceed to a point where the purpose of arbitration—to obtain a speedy, inexpensive and final resolution of disputes—is frustrated is conduct that estops

a party from claiming a right to a stay of the proceedings and referral for contractual arbitration." *Id.* at 621–22 (quoting *Meyer v. Classified Ins. of Wis.*, 507 N.W.2d 149, 155 (Wis. Ct. App. 1993)). Similarly, the clinic's multi-year delay in asserting its rights under Iowa Code section 147.140 defeated the cost-saving goal of that statute.

Whether a party has waived its statutory right by its inconsistent litigation conduct can be a question of law "for the court to decide." *Mod. Piping*, 581 N.W.2d at 620 (quoting *Tjeerdsma v. Glob. Steel Bldgs., Inc.*, 466 N.W.2d 643, 645 (S.D. 1991)). On this record, the clinic through its prolonged litigation conduct waived its right to dismissal under Iowa Code section 147.140(6) as a matter of law.

The clinic relies in part on a nonwaiver holding in *McHugh v. Smith*, 966 N.W.2d 285, 291 (Iowa Ct. App. 2021). That case is easily distinguished. In *McHugh*, the plaintiff missed the deadline to serve a certificate of merit affidavit and the defendants, within several months, filed a motion to dismiss under section 147.140(6). *Id.* at 287. The plaintiff resisted, arguing that the defendants had "constructively waived" the requirement by serving written discovery and granting a one-month extension for discovery responses. *Id.* at 291. The court of appeals correctly rejected the waiver argument and affirmed the district court's dismissal under section 147.140(6). *Id.* Unlike the defendants in *McHugh*, the clinic litigated S.K.'s case through trial and appellate briefing before filing a motion under section 147.140(6) nearly four and a half years after the deadline for a sworn certificate of merit affidavit.

It is true that the defendant healthcare clinic need not show prejudice resulting from the plaintiff's delay in serving a properly sworn certificate of merit affidavit after the statutory deadline. *See Miller*, 7 N.W.3d at 377. But in *Miller*, the defendants filed their dispositive motions under section 147.140(6) within

three months of the missed deadline, so there was no ground to assert any implied waiver by the defendants' litigation conduct and delay. *See id.* at 371–72. Our chapter 679A cases consider whether the *nonmoving* party was prejudiced by the moving party's delay in seeking arbitration, and consider the added costs of litigation as prejudicial. *See Mod. Piping*, 581 N.W.2d at 621.

Another form of prejudice to the nonmoving party is an intervening expiration of the statute of limitations. S.K.'s claims as a minor will not be time-barred until 2028. But other medical malpractice plaintiffs would be prejudiced by the defendant's delay in seeking dismissal under section 147.140(6) if the statute of limitations expires in the interim. This is because we have recognized the plaintiff's right to voluntarily dismiss without prejudice and refile within the statute of limitations to restart the clock for serving a properly sworn certificate of merit affidavit. *See Miller*, 7 N.W.3d at 377 n. 5; *Ronnfeldt v. Shelby Cnty. Chris A. Myrtue Mem'l Hosp.*, 984 N.W.2d 418, 429 (Iowa 2023). The *LaLonde* court considered the fact that the statute of limitations had expired in holding that the defendant waived the certificate of merit issue. 593 S.W.3d at 229 ("Though defendants are not expected to bend over backwards to save the plaintiffs' claims, allowing limitations to expire before asserting a right that significantly pre-existed the time bar provides some indication they intended to waive the pleading defect and the remedy.").

The clinic had a right to seek a dismissal under section 147.140(6) as of February 17, 2020. The clinic waived that right by waiting until July 31, 2024, well after trial and final judgment, to raise the unsworn certificate of merit affidavit issue for the first time on appeal. A renewed motion by the clinic under section 147.140(6) in this case on remand must be denied on that ground.

With the foregoing additional explanation, I join the court's opinion in full.

Christensen, C.J., and McDonald and McDermott, JJ., join this concurrence.